Sandra M. MARMADUKE,
Plaintiff/Respondent,

v.

CBL & ASSOCIATES MANAGEMENT,
INC. and ERMC III Property Management Company, LLC, Defendants/Appellants.

No. ED 104150

Missouri Court of Appeals,
Eastern District,
DIVISION FOUR.

Filed: June 6, 2017

FOR APPELLANT: Robert L. Nussbaumer, 800 Market Street, Suite 350, St. Louis, Missouri 63101.

FOR RESPONDENT: Mark Bishop, P.O. Box 740, Hillsboro, Missouri 63050.

## OPINION

James M. Dowd, Presiding Judge

Sandra M. Marmaduke slipped and fell in the common area of the South County Mall ("Mall") located in St. Louis County. Marmaduke brought a premises liability lawsuit against the Mall owner, CBL & Associates Management, Inc. ("CBL"), and the company that CBL hired for housekeeping, maintenance, and security services at the Mall, ERMC III Property Management Company, LLC ("ERMC III") (collectively "Appellants"). A jury found Appellants 90% at fault and Marmaduke 10% at fault for the fall and assessed Marmaduke's damages at $90,000. The court reduced the damages by the assessed percentage of Marmaduke's comparative fault and entered judgment in the amount of $81,000 plus court costs.

Appellants raise six points of error on this appeal: (1) that Marmaduke failed to prove that Appellants had actual or constructive knowledge of the dangerous condition; (2) that the trial court erred by allowing Marmaduke, who had alleged that Appellants spoliated relevant evidence in the form of maintenance dispatch logs and videotape of Marmaduke's fall, to present evidence of Appellants' usual practice of maintaining dispatch logs and their use of video cameras at the Mall; (3) that the trial court erred by denying Appellants' objections to Marmaduke's closing argument that inferred that Appellants had spoliated evidence; (4) that the jury's assessment of

10% fault to Marmaduke was against the weight of the evidence; (5) that the trial court erred by instructing the jury that it could consider the Appellants together as one party for purposes of liability; and (6) that the trial court erred by allowing Marmaduke to present evidence of the medical treatment and charges related to her knee and hip replacement surgeries because there was no expert medical testimony connecting that treatment to Marmaduke's fall. For the reasons that follow, we affirm.

## Factual and Procedural Background

In August 2009, Marmaduke and her granddaughter were walking through the common area of the Mall when Marmaduke slipped and fell on cheese sauce that had apparently been spilled on the floor, though the culprit was never identified. The Mall security supervisor, James McNeil, responded to the area of Marmaduke's fall, took pictures of Marmaduke and the scene of the fall, and prepared an incident report. About two weeks later, Marmaduke's attorney sent written notice of her claim to Mall officials.

In April 2013, Marmaduke filed suit against Appellants. Marmaduke sent Appellants formal discovery requests seeking production of any videotape footage taken on the day of Marmaduke's fall of the common area where the fall took place. Marmaduke also requested production of any maintenance dispatch logs pertaining to the spilled cheese and to Marmaduke's fall. Appellants denied the existence of any videotape or dispatch log relating to Marmaduke's fall.

In response to Marmaduke's request for admissions, Appellants also denied that any videotape or dispatch log relating to Marmaduke's fall had been created, but indicated that if a dispatch log had existed, it was destroyed by a water main break that occurred at the Mall in May 2011.

Moreover, Appellants denied having access to a video surveillance system that had the capability of recording Marmaduke's fall, and denied destroying any videotape.

Marmaduke's attorney then took the depositions of two of Appellants' designated corporate representatives and of security supervisor McNeil. The depositions revealed that contrary to Appellants' written discovery responses, Appellants had the capacity to create dispatch logs and video recordings on the day of Marmaduke's fall and video recordings were made on the day of Marmaduke's fall. In addition, and again contrary to Appellants' written discovery responses that no dispatch log had been generated in connection with Marmaduke's fall, the depositions called into question whether such a dispatch log had in fact been created.

As a result of these revelations, Marmaduke filed a motion for sanctions seeking an adverse evidentiary inference against Appellants alleging that Appellants spoliated surveillance videotape of the area of Marmaduke's fall and the dispatch log relating to her fall. Specifically, Marmaduke wanted to be able to tell the jury that it "may draw an adverse inference to the effect that, had the video recording been maintained it would show the cheese spill on the floor for some period of time prior to Mrs. Marmaduke's fall, the fall [itself], the response of the [Appellants'] employees, and [Marmaduke's] actions before and after the fall." Further, Marmaduke requested the court to bar Appellants from making any argument or presenting any evidence that Appellants were not aware of the cheese spill prior to Marmaduke's fall. The court denied Marmaduke's motion for sanctions.

For their part, Appellants filed a motion in limine seeking to preclude Marmaduke from presenting any evidence at trial regarding the circumstances of the disap-

pearance of the dispatch log and videotape relating to Marmaduke's fall. The court denied Appellants' motion in limine, ruling that while Marmaduke was not entitled to an adverse inference, she could question witnesses on the subject of Appellants' usual practice of maintaining dispatch logs and the use of video cameras related to incidents like Marmaduke's fall.

At trial, regarding the fall itself, the jury heard testimony from Marmaduke and her granddaughter, and the jury was also read portions of McNeil's deposition testimony. Significantly, Marmaduke testified that McNeil told her that he was aware of the cheese spill prior to her fall but had not yet had time to clean it up.

As to Appellants' practice of maintaining dispatch logs and their use of video cameras, the jury heard deposition testimony from Appellants' corporate representatives. Specifically, the security director for the Mall testified that the normal policy is for a dispatch log to be created any time a maintenance call comes in and that they generally keep video recordings for thirty days unless they are notified of an incident. If they are notified of an incident, they would review the video and save it indefinitely if it has captured an incident. The Mall's security director also testified that Appellants had the capacity to create dispatch logs and video on the day of Marmaduke's fall, and that there was currently a video camera in the common area where Marmaduke fell.

Corporate representative Zachary Morris testified that dispatch logs are created when someone is staffing the cameras in the Mall; that he was sure video recordings were made on the day of Marmaduke's fall, that Appellants first became aware of Marmaduke's injury on the day of the fall, and that Appellants took no action to find out if a dispatch log existed or to preserve any video recordings after

receiving the letter from Marmaduke's lawyer.

Kevin Whirley, the director of operations at the Mall, testified that there were fifty-eight video cameras in the Mall and that there was a water main break at the Mall in May 2011 that would have destroyed any dispatch log related to Marmaduke's fall.

The jury also heard deposition testimony from McNeil that there were cameras in the area where Marmaduke fell. McNeil testified that the video image was displayed on screens at the dispatcher's desk where the video was recorded. McNeil testified that he did not review any video of Marmaduke's fall because that was not a part of his job. He testified that there would be a dispatch log for Marmaduke's fall. McNeil testified that he filled out a report documenting Marmaduke's fall for liability reasons and because they kept track of everything that happened at the Mall.

The court allowed Marmaduke to read to the jury Appellants' contradicting discovery responses in which Appellants represented that there was no dispatch log or video of Marmaduke's fall. Marmaduke also read to the jury Appellants' answers to Marmaduke's request for admissions in which Appellants admitted that they received notice of Marmaduke's claim from her attorney on or about August 28, 2009, denied that a dispatch log was created on the day of Marmaduke's fall, and denied having access to a video surveillance system that had the capability of recording the common area of Marmaduke's fall.

In closing argument, Marmaduke asserted that Appellants knew about the cheese spill before Marmaduke's fall because McNeil told Marmaduke he was aware of it but had not yet had time to clean it up. In addition, Marmaduke argued that Ap-

pellants had security personnel who monitored the video screens and would have seen it. Marmaduke also argued that Appellants lied about not having evidence of a dispatch log and video recording and that Appellants allowed it to be destroyed when they should have preserved it because they were on notice of Marmaduke's claim. Marmaduke argued that the jury could infer that Appellants did not keep the video because it showed something unfavorable to Appellants' defense. As to the dispatch log, Appellants argued that if the dispatch log had been produced, it would have corroborated Marmaduke's version of events with regard to when Appellants were notified of the cheese spill.

For their part, Appellants argued that they did not destroy any evidence and that Marmaduke was simply trying to inflame the jury.

Following the entry of judgment, Appellants filed a motion for judgment notwithstanding the verdict, or in the alternative, a motion for new trial. The trial court denied both motions. This appeal follows.

## Discussion

### I. Actual or Constructive Knowledge of the Slippery Cheese

■ In point I, Appellants contend that the trial court erred in denying their motion for a directed verdict and motion for judgment notwithstanding the verdict because Marmaduke failed to make a submissible case of liability in that she failed to prove that Appellants had actual or constructive knowledge of the cheese spill prior to Marmaduke's fall. We disagree.

■ Our standard of review on the denial of a motion for directed verdict and the denial of a motion for judgment notwithstanding the verdict is essentially the same. *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 14 (Mo.banc 2012). A case

may not be submitted unless each and every fact essential to liability is predicated on legal and substantial evidence. *Id.* In determining whether the evidence was sufficient to support the jury's verdict, we view the evidence in the light most favorable to the verdict and the plaintiff is given the benefit of all reasonable inferences. *Id.* We will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. *Id.*

■ To establish a claim for premises liability under a theory of negligence, a plaintiff must show: (1) a dangerous condition existed on defendant's premises which involved an unreasonable risk; (2) the defendant knew or by using ordinary care should have known of the condition; (3) the defendant failed to use ordinary care to remove or warn of the danger; and (4) the plaintiff sustained injuries as a result of such condition. *Steward v. Baywood Condo. Ass'n*, 134 S.W.3d 679, 682 (Mo.App. E.D. 2004).

Here, Appellants attack only the second element of the cause of action. We find that Marmaduke made a submissible case that Appellants had actual or constructive knowledge of the cheese spill based on her testimony that Mall security officer McNeil told her upon arriving at the scene of her fall that he had received a report about the cheese spill but had not yet had time to clean it up. While McNeil did not admit to the statement Marmaduke attributed to him, the jury was free to disbelieve his denial and believe Marmaduke especially when it was undisputed that Marmaduke and McNeil had a post-fall conversation as part of McNeil's investigation. Given our standard of review, this testimony alone was sufficient evidence to establish that Appellants had actual or constructive knowledge of the cheese spill. Further, the jury heard evidence that

there was a large amount of cheese spilled that was open and obvious, that Appellants employed more than fifty video cameras at the Mall, including cameras in the common area where Marmaduke fell, and that the camera feeds could have been monitored by Mall security personnel in the dispatch room. From this evidence, the jury could have inferred that Appellants knew or by using ordinary care should have known of the cheese spill. Point I is denied.

## II. The Missing Videotape and Dispatch Log

In point II, Appellants contend that the trial court erred by allowing Marmaduke to present evidence in support of her assertion that Appellants allowed a dispatch log and a surveillance videotape relating to Marmaduke's fall to be destroyed. Marmaduke had sought an adverse evidentiary inference as to this evidence pursuant to the spoliation doctrine. Appellants asked the court to exclude any evidence regarding the circumstances of the missing evidence because Appellants were not guilty of spoliation. The court denied Marmaduke's request for a negative inference but ruled that Marmaduke could question witnesses on the subject of Appellants' usual practice of maintaining dispatch logs and their use of video cameras and how and to whom incidents like Marmaduke's fall were reported.

It is manifest that if a dispatch log and videotape relevant to Marmaduke's fall existed and had been produced in discovery, they would have been admissible at trial so long as the requirements of The Uniform Business Records as Evidence Law were met.[1] The dispatch log and videotape, however, were not available at trial. As to this

evidence, Marmaduke failed to convince the trial court that Appellants had spoliated the evidence. Thus, the trial court did not grant Marmaduke an adverse evidentiary inference, but that did not end this issue as an evidentiary matter or whether the imposition of discovery sanctions was warranted. The trial court still had to determine what evidence pertaining to the circumstances surrounding the handling of the dispatch log and videotape would be allowed, if any, and what sanctions, if any, were appropriate.

We hold that the court did not err in its handling of the issue of the apparently spoliated evidence because the evidence the court allowed on this issue—Appellants' normal practices for handling such evidence—was relevant and admissible to the question of Appellants' negligence, bias, interest, and credibility. Moreover, Appellants were certainly not prejudiced when, based on our review of the record in light of the spoliation doctrine and the Rule 61.01 discovery sanctions that were available to the court, the court would have been justified in entering significantly more severe remedies for the apparent spoliation of the videotape and maintenance dispatch log than simply allowing Marmaduke to question Appellants' witnesses regarding its normal handling of such items of evidence.

### 1. Standard of Review

■■■ We review the trial court's rulings on the admission of evidence for an abuse of discretion. *Gallagher v. Daimler-Chrysler Corp.*, 238 S.W.3d 157, 162, 166 (Mo.App.E.D. 2007). We presume that a ruling within the trial court's discretion is correct. *Id.* at 166. An abuse of discretion

---

1. See §§ 490.660-490.690 RSMo (2017); see also *Saint Louis Univ. v. Geary*, 321 S.W.3d 282, 289 (Mo.banc 2009) (setting forth that whether a videotape should be admitted or

rejected depends on whether it is practical, instructive, and calculated to assist the trier of fact in understanding the case).

occurs when the trial court's ruling is clearly against the logic of the circumstances before the court at the time and is so unreasonable and arbitrary that it shocks one's sense of justice and indicates a lack of careful consideration. *Id.* at 162. If reasonable persons can differ about the propriety of the trial court's actions, then there is no abuse of discretion by the trial court. *Eagan v. Duello*, 173 S.W.3d 341, 346 (Mo.App.W.D. 2005). Even when an evidentiary ruling is in error, this court will not set aside the jury's verdict unless that error likely changed the outcome of the case. *Barkley v. McKeever Enters., Inc.*, 456 S.W.3d 829, 842 (Mo.banc 2015).

▆▆▆▆ The trial court is vested with broad discretion to control discovery and to fashion a remedy to address any non-disclosure of evidence. *Zimmer v. Fisher*, 171 S.W.3d 76, 79 (Mo.App.E.D. 2005).

### 2. Evidence Admissibility Principles

▆▆▆▆ Relevant and material evidence may not be excluded solely because it tends to prejudice the jury against a party. *Brown v. Hamid*, 856 S.W.2d 51, 56 (Mo.banc 1993). The test for relevancy is whether an offered fact tends to prove or disprove a fact in issue or corroborates other relevant evidence. *Id.* Nevertheless, evidence may be excluded if it introduces collateral issues and a confusion of the issues would result. *Id.* Even if error occurs in the admission of evidence, it is not grounds for reversal if it is not prejudicial. *Sanders v. Hartville Mill. Co.*, 14 S.W.3d 188, 213 (Mo.App.S.D. 2000) (citing *Riley v. Union Pac. R.R.*, 904 S.W.2d 437, 443 (Mo.App.W.D. 1995)).

▆▆▆▆ A custom is an ordinary or usual manner of doing something. *Bowan ex rel. Bowan v. Express Med. Transporters, Inc.*, 135 S.W.3d 452, 460 (Mo.App. E.D. 2004) (citing *Davis v. Gatewood*, 299 S.W.2d 504, 509 (Mo. 1957)). Evidence of business custom and practice is admissible in civil cases as evidence to prove actions in conformity with that custom or practice. See *Sanders*, 14 S.W.3d at 212; *First Nat. Bank of Independence v. Mid-Century Ins. Co.*, 559 S.W.2d 50, 52 (Mo.App. 1977). Evidence of a business routine or custom may establish an act was performed. *Miles Homes Div. of Insilco Corp. v. First State Bank of Joplin*, 782 S.W.2d 798, 802 (Mo. App.S.D. 1990).

▆▆▆▆ A witness may be interrogated as to attempts to tamper with or influence evidence for purposes of impeachment and bias so long as the proper foundation is laid. See *Strahl v. Turner*, 310 S.W.2d 833, 844 (Mo. 1958). The same holds true for independent evidence used for impeachment and bias. *Id.* Indeed, the credibility of a witness is always a relevant issue in a lawsuit. *Mitchell v. Kardesch*, 313 S.W.3d 667, 675 (Mo.banc 2010). A party may test a witness's credibility on cross-examination by impeaching the witness through the admission of evidence of the witness's bias, interest, or prejudice. *Id.* at 675-76. Indeed, it is well-settled that the interest or bias of a witness and her relation to or feeling toward a party are never irrelevant, and cross-examination about any issue, regardless of its materiality to the substantive issues at trial, is permissible if it shows bias or interest of the witness because a witness's bias or interest could affect the reliability of the witness's testimony on any issue. *Id.* at 676. This has long been permitted in Missouri, subject to the trial court's discretion in limiting, or in rare circumstances, precluding such evidence entirely so as to avoid undue prejudice. *Id.*

### 3. The Spoliation Doctrine and Discovery Sanctions in Missouri: From the

### Chimney Sweep and the Goldsmith[2] to Missouri Supreme Court Rule 61.01

What to do when a party is deprived of evidence relevant to a civil suit because the opponent has destroyed it, allowed it to be destroyed, or simply fails to produce it has troubled Anglo-American courts for nearly 300 years.[3]

#### a. Spoliation Doctrine

The origin of the spoliation doctrine is often traced back to the early 18th Century case of *Armory v. Delamirie*, 93 Eng. Rep. 664 (K.B.1722). See, e.g., *Sullivan v. Gen. Motors Corp.*, 772 F.Supp. 358, 360 n.3 (N.D. Ohio 1991); *Goodman v. Praxair Servs., Inc.*, 632 F.Supp.2d 494, 517 n.12 (D. Md. 2009). *Armory* reads like a Dickensian tale of avarice and trickery. *Goodman*, 632 F.Supp.2d at 517 n.12 (citing *Armory*, 93 Eng. Rep. at 664). A chimney sweeper's boy discovered a piece of jewelry and carried it to a goldsmith's shop. *Id.* The goldsmith handed the jewelry to his apprentice, "who under pretence of weighing it," removed the stones, and then informed the goldsmith that the jewelry was worth "three halfpence." *Id.* (quoting *Armory*, 93 Eng. Rep. at 664). The goldsmith offered the boy the money, but he refused, and demanded to have the jewelry returned to him intact. *Id.* The apprentice deceitfully handed back to the boy "the socket without the stones," and the boy subsequently brought forth a common law claim of trover against the goldsmith. *Id.* (quoting *Armory*, 93 Eng. Rep. at 664). At trial, "the Chief Justice directed the jury, that unless the [goldsmith] did produce the

jewel, and shew it not to be of the finest water, they should *presume the strongest against him*, and make the value of the best jewels the measure of their damages: which they accordingly did." *Id.* (quoting *Armory*, 93 Eng. Rep. at 664).

Missouri's abhorrence of spoliation dates back over 130 years and employs some of the strongest language to be found anywhere in its jurisprudence: "The law, in hatred of the spoliator, baffles the destroyer, and thwarts his iniquitous purpose, by indulging a presumption which supplies the lost proof, and thus defeats the wrongdoer by the very means he had so confidently employed to perpetrate the wrongdoing." *Pomeroy v. Benton*, 77 Mo. 64, 86 (1882). As stated in the Latin maxim *omnia praesumuntur in odium spoliatoris*, all things are presumed against the wrongdoer. *Id.*; *Brown*, 856 S.W.2d at 56. Then in *Shawhan v. Shawhan Distillery Co.*, 195 Mo.App. 445,197 S.W. 369, 370 (Mo.App. 1916), the court stressed that "[t]he spoliation by a party of documentary evidence which may, or may not, be valuable to his antagonist, has always received the strongest judicial condemnation, and the rule of the ancient maxim that all things are presumed against the spoliator has always been applied with the utmost rigor and sternness." Thus, a party's spoliation of critical case-related information strikes to the heart of our system of justice with no less damage than a party that has through intimidation or violence caused a critical witness to go missing or to refuse to testify.[4]

---

2. *Armory v. Delamirie*, 93 Eng. Rep. 664 (K.B. 1722).

3. *Id.*

4. Cf. § 575.270 RSMo (2017) (setting forth the elements of tampering with a witness or a victim) with § 575.100 RSMo (2017) (setting forth the elements of tampering with physical

evidence); see also Mo. Supreme Court Rules of Prof'l Conduct R. 4-3.4 (2007) ("A lawyer shall not: (a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act;"). See *Pikey v.*

### b. Current Application of the Spoliation Doctrine in Missouri [5]

Spoliation is the intentional act of destruction or significant alteration of evidence. *Pisoni v. Steak 'N Shake Operations, Inc.*, 468 S.W.3d 922, 926 (Mo.App. E.D. 2015). Spoliation may also be the concealment or suppression of relevant evidence or the failure to determine whether certain evidence exists. *Id.* (citing *DeGraffenreid v. R.L. Hannah Trucking Co.*, 80 S.W.3d 866, 874, 878 (Mo.App.W.D. 2002)). To constitute spoliation, the destructive act must be intentional, indicating fraud, deceit, or bad faith. *Pisoni*, 468 S.W.3d at 926. The failure to adequately explain the evidence's destruction may give rise to an adverse inference. *Id.* In such cases, it may be shown by the movant that the alleged spoliator had a duty, or should have recognized a duty, to preserve the evidence. *Wilmes v. Consumers Oil Co. of Maryville*, 473 S.W.3d 705, 718 (Mo.App. W.D. 2015); *Morris v. J.C. Penney Life Ins. Co.*, 895 S.W.2d 73, 77-78 (Mo.App. W.D. 1995). Simple negligence is not sufficient to satisfy the mental-state element of spoliation. *DeGraffenreid*, 80 S.W.3d at 873. Thus, the burden is on the party seeking the application and the benefit of the spoliation doctrine to make a prima facie showing that the opponent destroyed the missing evidence under circumstances manifesting fraud, deceit, or bad faith. *Id.*

### c. The Failure to Abide by a Duty to Preserve Evidence May Support the Intent Element Necessary to Apply the Spoliation Doctrine

The *Morris* court addressed the mental state required for the application of the spoliation doctrine and held that an inference of fraud and a desire to suppress the truth may be established if "the alleged spoliator had a *duty*, or should have recognized a *duty*, to preserve the evidence." 895 S.W.2d at 77-78. Thus, the inference of fraud, deceit, bad faith, or a desire to suppress the truth is not divorced from the question of whether the spoliator had a duty or should have recognized a duty to preserve the evidence. *Id.* Rather, whether a spoliator had a duty to preserve evidence, for example, in the course of employment or business, may become part and parcel to a determination of fraud, deceit, bad faith, or a desire to suppress. *Id.*; see also *Moore v. Gen. Motors Corp.*, 558 S.W.2d 720, 735 (Mo.App. 1977) (holding that there was no evidence of bad faith in the destruction of records where the alleged spoliator did not know it was facing litigation and was not on notice it should not pursue its customary practice of destroying records); *Brissette v. Milner Chevrolet Co.*, 479 S.W.2d 176, 183 (Mo. App. 1972) ("We do not in any manner encourage a party to be lax concerning the preservation of evidence. We do not in any way imply that a party is under no duty to preserve the object for discovery and evidentiary purposes."). And a party's failure to adequately explain missing evidence, may give rise to an adverse inference. *Pisoni*, 468 S.W.3d at 926.

### d. Remedies for Spoliation

Courts have struggled over the years to fashion an appropriate and balanced remedy when spoliation has been found. See *Henderson v. Tyrrell*, 80 Wash.App. 592, 910 P.2d 522, 604-05 (1996). Courts generally have relied upon two methods to remedy spoliation: (1) recognizing an independent cause of action for intentional and/or negligent spoliation; and (2) civil discovery or evidentiary sanctions in pending litigation. See *Fisher v. Bauer Corp.*, 239

*Bryant*, 203 S.W.3d 817, 825 (Mo.App.S.D. 2006).

5. See generally *Pikey v. Bryant*, 203 S.W.3d 817 (Mo.App.S.D. 2006).

S.W.3d 693, 701-04 (Mo. App. E.D. 2007); *Brown*, 856 S.W.2d at 56-57; *Pikey*, 203 S.W.3d at 822-23.

Several jurisdictions have recognized a cause of action for the intentional spoliation of evidence, though a greater number of jurisdictions do not. *Pikey*, 203 S.W.3d at 822-23; *Brown*, 856 S.W.2d at 56 (citing John F. Medler, Jr., *Spoliation Of Evidence In Civil Cases*, 39 St. Louis B.J. 14, 20-21 (1993); Thomas G. Fischer, *Intentional Spoliation of Evidence, Interfering with Prospective Civil Action, As Actionable*, 70 A.L.R.4th 984 (1989)). Missouri has remained in the majority of states that have not recognized an independent cause of action based on the spoliation of evidence. *Fisher*, 239 S.W.3d at 701; *Pikey*, 203 S.W.3d at 825; *Brown*, 856 S.W.2d at 56-57; *Baugher v. Gates Rubber Co., Inc.*, 863 S.W.2d 905, 907-14 (Mo.App.E.D, 1993). Instead, Missouri has opted to allow the trial court to address the issue by impacting the evidence the jury may hear regarding the subject matter of the spoliated evidence. In doing so, courts have been cautioned to tailor the remedy to the problem, and to "take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms." *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 395 (1st Cir. 1990).

### e. The Scope of the Adverse Inference

■ In Missouri, the victim of spoliation is entitled to an adverse inference which holds the spoliator to admit that the missing evidence would have been unfavorable to its position. *Pisoni*, 468 S.W.3d at 926. The spoliator must admit what the evidence would have shown had it been available, but that admission is limited spe-cifically to that evidentiary question. *Id.* at 927. The party asserting the doctrine is not entitled to any further inferences as a matter of law regarding that evidence and is not entitled to an adverse inference jury instruction. *Id.* at 927-28; *Berger v. Copeland Corp., LLC*, 505 S.W.3d 337, 339-40 (Mo.App.S.D. 2016). The adverse inference does not prove the opposing party's case and the spoliator is left to determine whether any remaining evidence exists, outside of the unavailable evidence it must admit is unfavorable, to support his or her claim or defense. *Wilmes*, 473 S.W.3d at 718-19.

An inference is a permissible deduction the trier of fact may make without an express instruction of the law by the court. *Rose v. Mo. Dist. Tele. Co.*, 328 Mo. 1009, 43 S.W.2d 562, 569 (Mo.banc 1931). This is why a party is not entitled to an adverse inference jury instruction. *Pisoni*, 468 S.W.3d at 927-28; *Berger*, 505 S.W.3d at 339-40.

### f. Rule 61.01 [6] —Sanctions for Discovery Violations

■ Since the beginning of our State government, courts have had the authority to allow the pretrial discovery of evidence in preparation for a trial. *State ex rel. Schlueter Mfg. Co. v. Beck*, 337 Mo. 839, 849, 85 S.W.2d 1026 (Mo.banc 1935). Indeed, our early statutes relating to the production of documents by parties were deemed necessary to the administration of justice and were instituted to supplant the outdated bill of discovery used at English common law. *State ex rel. St. Louis Union Trust Co. v. Sartorius*, 351 Mo. 111, 119-20, 171 S.W.2d 569 (Mo. 1943). The purpose of pretrial discovery includes facilitating and expediting the preparation of cases

---

**6.** All references to rules are to the Missouri Supreme Court Rules (2016) unless otherwise indicated.

for trial, guarding against surprise and concealment, reducing delay, and assisting in determining the truth. *Id.; Concerned Citizens for Crystal City v. City of Crystal City*, 334 S.W.3d 519, 523 (Mo.App.E.D. 2010); *Fairbanks v. Weitzman*, 13 S.W.3d 313, 327 (Mo.App.E.D. 2000).

■ If the rules of discovery are to be effective, however, appropriate sanctions must be imposed on those who disobey the rules. *Combellick v. Rooks*, 401 S.W.2d 460, 464 (Mo.banc. 1966); *Thomas v. Fitch*, 435 S.W.2d 703, 707 (Mo.App. 1968). Indeed, the trial court is without discretion to refuse to require compliance with the discovery rules. *Combellick*, 401 S.W.2d at 464 (citing *State ex rel. Hudson v. Ginn*, 374 S.W.2d 34, 39 (Mo.banc 1964)). The Supreme Court of Missouri consolidated the law relating to the enforcement of the discovery rules in Rule 61.01, which became effective January 1, 1975.

■ Under Rule 61.01, a trial court has broad discretion to sanction a party's failure to appropriately respond to discovery requests. *Fairbanks*, 13 S.W.3d at 326-27. Specifically, with regard to the failure to produce documents and things, Rule 61.01(d) allows the trial court to make any order that is "just," including, but not limited to, striking pleadings, dismissing an action or any part thereof, rendering a default judgment, holding a party in contempt, ordering a party to pay reasonable expenses and attorney fees, or entering an order refusing to allow a party to support or oppose designated claims or defenses or prohibiting a party from introducing designated matters in evidence.

■ Before imposing sanctions, however, the trial court must first determine whether the opposing party was prejudiced by the party's conduct. *Trotter v. Distler*, 260 S.W.3d 913, 916 (Mo.App.E.D. 2008). Any Rule 61.01 sanction in excess of

that which is necessary to accomplish the purposes of discovery may be an abuse of discretion. *Cosby v. Cosby*, 202 S.W.3d 717, 722 (Mo.App.E.D. 2006).

Thus, we observe that the spoliation doctrine, the rules of discovery, and the corresponding broad authority of the trial court to sanction and punish violations all arise from the same place: the fundamental principle that a court must be supplied all the relevant facts in order to carry out its duties to the litigants and to society to discover the truth in a dispute and to mete out justice. This cannot be done effectively and fairly if one side has either withheld relevant information or materials or has destroyed them or allowed their destruction.

### g. The Complementary Roles of Rule 61.01 and the Spoliation Doctrine

Our review of the case law reveals that the spoliation doctrine and Rule 61.01 are two separate but related weapons a trial court has at its disposal to ensure the fundamental goals of a lawsuit: seek the truth and do justice. These two tools are not mutually exclusive and may work together to allow the trial court in its broad discretion to fashion the most appropriate remedy based on the circumstances in each case.

■ We note that the spoliation doctrine is distinct from the sanctions available under Rule 61.01 because it is not concerned with the prejudice caused to the opposing party as a result of the missing evidence, but works to punish the spoliator. See *Schneider v. G. Guilliams, Inc.*, 976 S.W.2d 522, 526 (Mo.App.E.D. 1998) ("Not concerned with whether the opposing party suffers prejudice as a result of the destroyed evidence, the doctrine works only to punish the spoliator."). Moreover, the spoliation doctrine carries a mental-state component because simple negli-

gence is not sufficient to apply the rule, while the trial court in a Rule 61.01 analysis looks to a remedy for prejudicial discovery violations that is "just," and the trial court need not find a party intentionally acted to issue a discovery sanction. See *Baldridge v. Dir. of Revenue, State of Mo.*, 82 S.W.3d 212, 223 (Mo.App.W.D. 2002); Rule 61.01(d).

### 4. The Trial Court's Ruling Here

■ With these principles in mind, we turn to the facts of this case and, more specifically, to the trial court's handling of the questions surrounding the videotape and dispatch log from the day of Marmaduke's fall. Under the circumstances of this case, we find that the trial court did not abuse its discretion in allowing Marmaduke to present evidence of Appellants' usual practice of maintaining dispatch logs and their use of video cameras.

First, there was considerable evidence presented at trial about these issues and Appellants did not object to most of this evidence, so Appellants have largely failed to properly preserve this issue for review. *Snellen ex rel. Snellen v. Capital Region Med. Ctr.*, 422 S.W.3d 343, 356 (Mo.App. W.D. 2013). Second, even had Appellants properly preserved this issue, the trial court did not abuse its discretion in admitting the evidence.

The trial court's specific ruling was that Marmaduke could question witnesses on the subject of Appellants' usual practice for maintaining dispatch logs and their use of video cameras, and how and to whom incidents like Marmaduke's fall were reported. This evidence was not only relevant to show Appellants' routine practice in handling incidents like Marmaduke's fall, but also to prove or disapprove a fact in issue: whether Appellants knew or by using ordinary care should have known of the spilled cheese. In fact, evidence that Appellants had surveillance video cameras in the area of Marmaduke's fall that may have been monitored by a dispatcher goes directly to whether Appellants knew or should have known of the spilled cheese, regardless of whether there was a recording of this evidence. For example, if Appellants' video surveillance system had only "live" video for the dispatcher to watch but did not keep recordings of that video, it would still be relevant to whether Appellants knew or should have known of the spilled cheese because the dispatcher could have seen the cheese spill prior to Marmaduke's fall.

Furthermore, this evidence corroborated other relevant evidence, namely McNeil's testimony that there were video cameras in the area of Marmaduke's fall, that the video from the cameras appeared on screens located at the dispatcher's desk, and that there would likely be a dispatch log relating to Marmaduke's fall. Specifically, evidence of Appellants' practice regarding dispatch logs and video in connection with falls at the Mall corroborated McNeil's testimony and went directly to whether Appellants knew or should have known of the spilled cheese.

Moreover, this evidence was also relevant to Appellants' credibility, interest, and bias. *Mitchell*, 313 S.W.3d at 675. If the jury believed that Appellants' usual practice was to generate and preserve a dispatch log and video relating to incidents like Marmaduke's and heard evidence that Appellants had the capability to generate both items at the time of Marmaduke's fall, then the jury could have inferred that Appellants were lying about not having a dispatch log and video related to Marmaduke's fall.

Furthermore, we find that when Marmaduke filed her motion for sanctions as a result of Appellants' failure to produce the videotape and dispatch log, the trial court

was presented with both a spoliation doctrine question and a discovery sanction issue pursuant to Rule 61.01. Since Marmaduke raised spoliation in its motion for discovery sanctions, the trial court apparently limited its focus to whether spoliation had occurred and whether the negative-inference sanction called for under the application of the spoliation doctrine should be granted. This was correct and proper and we find no error in the trial court's approach.

However, the trial court under the record in this case could have employed both spoliation doctrine principles and Rule 61.01 because the allegedly spoliated evidence had also been the subject of a proper discovery request and had not been produced pursuant to that request. In fact, Appellants submitted sworn written discovery responses that turned out to be false in light of the deposition testimony of several of Appellants' representatives. The record demonstrated that on the day of the incident Appellants were fully aware that Marmaduke had suffered a fall and that Appellants were subject to a claim being made arising from the fall. We know this because Appellants investigated the incident, interviewed Marmaduke at the scene of her fall, and McNeil filled out a report that he testified was made for liability reasons. Moreover, two weeks after the fall Appellants received a letter from Marmaduke's attorney formally notifying Appellants of Marmaduke's claim. Thus, we find that under these circumstances Appellants had a duty to preserve all evidence relevant to Marmaduke's claim.

Additionally, there was a stark contradiction between Appellants' deposition testimony that Appellants had the capability of preserving the videotape but failed to do so and Appellants' sworn discovery responses that they did not have the capability to create a videotape or dispatch log of Marmaduke's fall. All of these circumstances would have justified a finding of spoliation.

But again, while the trial court focused its analysis and ruling on the spoliation question, it did not have to. It could also have reviewed Marmaduke's motion for sanctions under Rule 61.01 as well and determined whether Appellants' failure to produce the requested videotape and dispatch log under the circumstances adduced by Marmaduke prejudiced Marmaduke and thus warranted any of the sanctions available under Rule 61.01(d), including but not limited to the following:

1. Striking Appellants' pleadings;

2. Entering a default judgment;

3. Holding Appellants in contempt;

4. Ordering Appellants to pay reasonable expenses and attorney fees for the discovery required to uncover the circumstances of the missing evidence; and/or

5. Entering an order refusing to allow Appellants to support or oppose designated claims or defenses or prohibiting Appellants from introducing designated matters in evidence.

Rule 61.01(d); *Trotter*, 260 S.W.3d at 916.

However, the trial court's apparent failure to consider additional sanctions under Rule 61.01 beyond a spoliation doctrine negative inference certainly did not prejudice Appellants since the record before the trial court would have warranted the trial court's consideration of additional sanctions, particularly the remedy denominated above under subparagraph five. Specifically, the trial court could have fashioned a remedy limiting the evidence Appellants were permitted to introduce relating to what the missing dispatch log and videotape would have shown. Rule 61.01(d). If the trial court determined that Marmaduke was deprived of videotaped evidence

showing matters such as the length of time the spilled cheese was on the floor, Marmaduke's fall itself, or the presence of any of Appellants' employees or agents in the vicinity of the spilled cheese, the trial court had the authority under Rule 61.01(d) to limit the evidence Appellants could offer on these subjects. Again, the trial court has considerable discretion in this area to fashion a remedy that is "just" and would have to consider whether it would be "just" to allow a party who has failed to preserve and produce videotape evidence of a slip-and-fall to offer evidence on matters that the videotape evidence would have likely and conclusively contradicted.

We recognize that Missouri's spoliation jurisprudence permits the spoliating party to offer "any remaining evidence ... outside of the unavailable evidence it must admit is unfavorable, to support his or her claim or defense." *Wilmes*, 473 S.W.3d at 718-19. However, this principle should be read together with Rule 61.01(d) which permits the trial court to limit evidence that a party may offer on matters that the spoliated evidence would have shown consistent with Rule 61.01's guiding principles of prejudice and justice. Rule 61.01(d).

While the spoliation doctrine and Rule 61.01 differ because spoliation does not require a showing of prejudice and Rule 61.01 does, the record here would support a finding of Rule 61.01 prejudice. In fact, if the videotape and dispatch log showed the scene of Marmaduke's fall, the length of time the cheese spill was on the floor, the time in relation to the fall when Appellants were alerted to the danger, and any other matters relevant to the liability issues in this case, prejudice to Marmaduke would be manifest. We, of course, defer to the trial court's discretion on questions of spoliation and whether prejudicial discovery violations have occurred. Nevertheless, we observe generally that the destruction of a videotape of a fall on a slippery substance on the floor that shows the length of time the substance remained on the floor is tantamount to the suppression of the testimony of an eye witness. Point denied.

### III. Closing Argument

 In point III, Appellants contend that the trial court erred in denying Appellants' objections to strike Marmaduke's closing argument that Appellants spoliated evidence because Marmaduke's argument was not supported by the evidence. Finding no abuse of discretion, point III is denied.

 A trial court's ruling in closing argument is reviewed for an abuse of discretion. *Nelson v. Waxman*, 9 S.W.3d 601, 606 (Mo.banc 2000). Counsel is given wide latitude to suggest inferences from the evidence in closing argument, even if the inferences drawn are illogical or erroneous. *Id.*

During closing argument, Marmaduke argued that Appellants lied about not having video of her fall and that Appellants allowed the videotaped evidence to be destroyed because it was unfavorable to Appellants. Appellants objected to this evidence on the ground that it was not supported by the evidence but the court overruled Appellants' objections. This was not an abuse of discretion. As stated above, the trial court could have found that Marmaduke was entitled to an adverse evidentiary inference based on the record before us, but did not and left it to the jury to determine what inferences, if any, to draw from the lack of a dispatch log and video. Sufficient evidence was presented to allow Marmaduke to argue during closing argument that Appellants destroyed the evidence. Point III is denied.

### IV. Comparative Fault

In point IV, Appellants contend that the trial court erred in denying Appellants' motion for judgment notwithstanding the verdict, or in the alternative, a motion for new trial because the jury's assessment of only 10% fault to Marmaduke is against the weight of the evidence and is grossly disproportionate to the evidence. We disagree.

In determining whether the evidence was sufficient to support the jury's verdict on review of the denial of a motion for judgment notwithstanding the verdict, an appellate court views the evidence in the light most favorable to the verdict and the plaintiff is given the benefit of all reasonable inferences. *Roberts*, 367 S.W.3d at 14. We will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. *Id.* The standard of review of the denial of a motion for new trial is an abuse of discretion. *Self v. Brunson*, 213 S.W.3d 149, 153 (Mo.App.E.D. 2006).

Here, there was ample evidence to support the jury's verdict and the trial court did not abuse its discretion in denying Appellants' motion for new trial. Appellants rely on security officer McNeil's testimony that he was in the area where Marmaduke fell ten minutes before the fall and that he did not see any spilled cheese at that time, and on Marmaduke's testimony that she was not looking down when she fell. However, Appellants improperly ignore the evidence that supported the jury's assessment of fault. Specifically, Marmaduke testified that McNeil told her that he was aware of the cheese spill but had not yet had time to clean it up, and that she was paying attention before she fell. Viewing this evidence in the light most favorable to the verdict and giving Marmaduke the benefit of all reasonable inferences, we find that the jury's assessment

of fault between the parties was supported by the evidence and the trial court did not abuse its discretion in denying Appellants' motion for judgment notwithstanding the verdict, or in the alternative, a motion for new trial. Point IV is denied.

### V. Jury Instruction on the Agency Relationship between Appellants

In point V, Appellants contend that the trial court erred in instructing the jury to consider the Appellants together as one party for purposes of liability because there was insufficient evidence that an agency relationship existed between the Appellants. Specifically, Appellants contend that Marmaduke did not establish that CBL had the ability to control ERMC III. Because the instruction was supported by the evidence and Appellants waived this issue, the point is denied.

Rule 84.04(e) provides that if a point on appeal relates to the giving, refusal, or modification of an instruction, such instruction shall be set forth in full in the argument portion of the brief. The omission of the instruction fails to preserve the point for review. *Hughes v. Palermo*, 911 S.W.2d 673, 674 (Mo.App.E.D. 1995). Appellants' brief does not set forth the instructions at issue and Appellants have therefore failed to preserve this point for review. *Id.* Nevertheless, we review Appellants' point *ex gratia* and find no error.

Whether a jury was properly instructed is a question of law that we review de novo. *Barkley*, 456 S.W.3d at 836. In doing so, we consider the evidence in the light most favorable to the submission of the instruction, and if the submission is supportable under any theory, then its submission is proper. *Id.* Moreover, if the instruction is given in error, we will vacate a judgment based on the jury's verdict only if the error resulted in preju-

dice that materially affected the merits of the action. *Id.* at 837.

 In civil cases, the court is not required to instruct upon any proposition of law arising in a case unless requested. *Miller v. Gillespie*, 853 S.W.2d 342, 345 (Mo.App.E.D. 1993); *Sullivan v. KSD/KSD-TV*, 661 S.W.2d 49, 51 (Mo.App.E.D. 1983). A party may not complain of the failure of the court to give an instruction not requested. *Sullivan*, 661 S.W.2d at 51. And the failure to tender an instruction preserves nothing for appellate review. *Leonard Missionary Baptist Church v. Sears, Roebuck & Co.*, 42 S.W.3d 833, 838 (Mo.App.E.D. 2001).

 The instructional question at issue concerns the agency relationship between Appellants. Agency is the fiduciary relationship which results from the consent by one party to another that the other shall act on its behalf subject to its control, and the agent's consent to so act. *State ex rel. Ford Motor Co. v. Bacon*, 63 S.W.3d 641, 642 (Mo.banc 2002). Generally, the relationship of principal-agent is a question of fact to be determined by the jury when there is a fair difference of opinion as to the existence of the relationship. *Johnson v. Bi-State Dev. Agency*, 793 S.W.2d 864, 867 (Mo.banc 1990). Only issues of fact which are genuinely in dispute need to be submitted to the jury. *Johnson v. Pac. Intermountain Express Co.*, 662 S.W.2d 237, 245 (Mo.banc 1983).

The Missouri Approved Jury Instructions ("MAI")[7] provide comparative-fault vicarious-liability instructions when agency is in issue and when agency is not disputed. When agency is in issue, MAI 37.05(1) applies, but when agency is not in dispute, MAI 37.05(2) applies.

 MAI 37.05(2) provides, in relevant part, that "[w]here the master or principal is sued with the servant or agent, and there is no issue of agency, a single verdict directing instruction may be directed against both the master and servant." The purpose of the instruction is to advise the jury that the conduct of the agent serves as the basis for the determination of any possible percentage of fault to be assessed against the master. *Cline v. William H. Friedman & Assocs., Inc.*, 882 S.W.2d 754, 762-63 (Mo.App.E.D. 1994).

Here, Appellants did not·submit MAI 37.05(1) to the court and did not request the court to instruct on agency. Thus, Appellants have waived this issue. *Miller*, 853 S.W.2d at 345; *Sullivan*, 661 S.W.2d at 51; *Leonard Missionary Baptist Church*, 42 S.W.3d at 838. Further, even if Appellants would have asked the court to instruct the jury on agency, we find that the issue of agency was not in dispute at trial.

CBL never raised the defense that ERMC III was not acting as its agent or was acting outside of the scope of its agency in this case. Marmaduke filed a one-count petition against both Appellants alleging that CBL was the owner of the Mall and that ERMC III was responsible for the housekeeping and security of the common area of the Mall pursuant to a contract with CBL. Appellants filed a joint answer to Marmaduke's petition admitting those allegations. Further, at trial, the director of operations at the Mall testified about the details of the relationship between CBL and ERMC III. Specifically, he testified that CBL hired ERMC III to ensure that the Mall's security, housekeeping, and maintenance were done properly on behalf of CBL, that he pays attention to the job ERMC III is doing, and that if he

7. All references to instructions are to the Missouri Approved Jury Instructions (7th ed. 2012).

has concerns about how ERMC III is doing its job, he will raise those concerns with ERMC III. Viewing this evidence in the light most favorable to the submission of the instruction, we find that agency was not in dispute and the court's instruction was proper. Point V is denied.

## VI. Evidence of Marmaduke's Knee and Hip Replacement Surgeries

█ In point VI, Appellants contend that the trial court erred in allowing Marmaduke to present evidence of her medical treatment and medical bills relating to her knee and hip replacement surgeries because there was no expert medical testimony connecting that treatment to the fall. Finding no abuse of discretion, the point is denied.

█ As previously noted, we review the trial court's rulings on the admission of evidence for an abuse of discretion. *Gallagher*, 238 S.W.3d at 166. A plaintiff may recover damages for aggravation of a preexisting condition caused by the negligent act of the defendant. *Ratcliff v. Sprint Mo., Inc.*, 261 S.W.3d 534, 543 (Mo. App.W.D. 2008).

At trial, Marmaduke read the redacted deposition of Dr. Richard Hulsey to the jury and the trial transcript indicates that the redacted deposition and unredacted deposition of Dr. Hulsey would become a part of the record on appeal. While Dr. Hulsey's unredacted deposition is included as an exhibit in the legal file, the redacted deposition is not included in the record on appeal. Moreover, numerous medical records and bills were also admitted into evidence as exhibits, but the exhibits are not included in the record on appeal.

█ Rule 81.12(a) provides that the record on appeal shall contain all of the record, proceedings, and evidence necessary to the determination of all questions presented to the appellate court for decision. The appellant is responsible for de-

positing all exhibits that are necessary for the determination of any point relied on. Mo. Sup. Ct. R. 81.12(e). Any exhibits not timely deposited may be considered by the court as immaterial to the issues on appeal. Mo. Sup. Ct. R. 81.16(c). When exhibits are omitted from the transcript and are not filed with the appellate court, the intendment and content of the exhibits will be taken as favorable to the trial court's ruling and as unfavorable to the appellant. *Rogers v. Hester ex rel. Mills*, 334 S.W.3d 528, 541 (Mo.App.S.D. 2010). In the absence of a complete record on appeal, an appellate court cannot review the merits of an appellant's claim and the appeal must be dismissed. *Davis v. Bradley*, 244 S.W.3d 194, 195 (Mo.App.E.D. 2007).

Here, Appellants have failed to provide this Court with Dr. Hulsey's redacted deposition that was read to the jury, and thus have failed to present all of the exhibits that are necessary for our review. This alone is a sufficient reason to dismiss this point. Nevertheless, we have reviewed Dr. Hulsey's unredacted deposition and conclude that the trial court did not abuse its discretion in allowing Marmaduke to present evidence of her medical treatment and bills related to her knee and hip replacement surgeries. Dr. Hulsey testified that Marmaduke's fall aggravated her arthritic symptoms related to those ailments, causing Marmaduke more pain, and the jury was allowed to consider that evidence in assessing Marmaduke's damages. Point denied.

### Conclusion

Based on the foregoing reasons, we affirm the trial court's judgment.

Kurt S. Odenwald, J., and Gary M. Gaertner, Jr., J., concur.