

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| TRIBUS, LLC, | ) | No. ED107460 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court of |
| | ) | St. Charles County |
| vs. | ) | |
| | ) | Honorable Jon A. Cunningham |
| GREATER METRO, INC., | ) | |
| | ) | |
| Respondent. | ) | Filed: November 19, 2019 |

## Introduction

Tribus, LLC ("Tribus") appeals from the trial court's entry of judgment for Greater Metro, Inc. ("Greater Metro"), in which it rejected Tribus' breach-of-contract claim against Greater Metro and granted Greater Metro's breach-of-contract counterclaim against Tribus. Tribus brings five points on appeal. Finding no merit to any of Tribus' points, we affirm the judgment.

## Factual and Procedural History[1]

### 1. Contract Obligations and Performance

Tribus is a custom software developer headquartered in St. Louis, Missouri, that builds digital tools, including websites and customer management relationship software ("CRM"), and

---

[1] The facts are presented in the light most favorable to the trial court's judgment. *Sheppard v. East*, 192 S.W.3d 518, 522 (Mo. App. E.D. 2006).

markets them to real estate brokerages. Greater Metro[2] is a residential real estate brokerage company. Roughly 350 real estate agents are affiliated with Greater Metro. Real estate agents affiliated with Greater Metro are independent contractors, not employees, of Greater Metro. On October 27, 2013, Tribus and Greater Metro executed a Consulting, Product Development & Licensing Agreement ("Contract"), which provided Tribus would create, design, and deploy a custom company website for Greater Metro; license both basic websites and upgraded websites to agents affiliated with Greater Metro; license CRM to Greater Metro; and provide content marketing services.

The term of the Contract was "thirty-six (36) months beginning on the date the [company] website is functionally deployed and accepted by [Greater Metro]." The Contract provided Greater Metro agreed to timely furnish, at its own expense, all information, items, and personnel required to complete the Contract. The Contract provided that if Greater Metro made no payment within thirty days of its due date, Greater Metro would be in breach of the Contract and the amount unpaid would be subject to 18% interest per month until paid in full. In addition, the Contract included the following integration clause: "NO WAIVER, MODIFICATION, ALTERATION, OR ADDITION TO THIS AGREEMENT, INCLUDING THE WORK STATEMENT, SHALL BE VALID UNLESS IN WRITING SIGNED BY BOTH PARTIES. THIS AGREEMENT, AND THE WORK STATEMENT CONSTITUTE THE ENTIRE CONTRACT BETWEEN THE PARTIES AND SUPERSEDES ALL PRIOR OR CONTEMPORANEOUS AGREEMENTS, CONDITIONS, AND PROPOSALS." Attached to the Contract was a "Statement of Work," which described the design and other services Tribus

---

[2] In 2013, Greater Metro was a franchisee of Prudential Real Estate and was known by the name Prudential Alliance. In 2014, Greater Metro became a franchisee of Berkshire Hathaway HomeServices and was known by the name Berkshire Hathaway HomeServices Alliance.

2

would provide Greater Metro. The Statement of Work provided the "[f]unctionality of each design must fall within the offerings of Tribus."

*Agent Websites*

The Contract provided Tribus would create basic agent websites for Greater Metro's agents and Greater Metro would pay Tribus recurring charges of $5,500 per month for the first 250 user accounts and $22 per month for each additional user. The Contract also provided Tribus would create upgraded agent websites and Greater Metro would pay $980 per month to license twenty upgraded agent websites. No time frame for completing the agent websites was included in the Contract. However, based on correspondence it had with Tribus before executing the Contract, Greater Metro expected the agent websites to be available and functional immediately after the Contract's execution. On October 25, 2013, two days before the Contract's execution, Greater Metro emailed Tribus, stating:

> I believe [Tribus] said that, while the company website would take 90 days to design and implement, the agent websites could be up much sooner. How is that? Wouldn't they be lacking content, IDX functionality,[3] etc.? What components of their website would be available to them initially in a couple of weeks?

In response, Tribus did not dispute this time frame and stated: "[W]e don't need the company site to get MLS[4] approval or setup the agent sites. We can definitely have them up and running within a week or two max." On October 27, 2013, the day of the Contract's execution, Greater Metro emailed Tribus, stating: "New agent sites immediately and custom built website in 60-90 days." In response, Tribus also did not dispute this time frame.

---

[3] "IDX functionality" refers to the ability of an agent's website to pull and display feeds of an agent's listings from a MLS service.

[4] "MLS" stands for "multiple listing service," which is a marketing database that provides accurate and structured data to cooperating real estate brokers about properties for sale in a particular locality.

Greater Metro and Tribus agreed Tribus would launch the agent websites before working on the company website. Tribus provided a placeholder for the company website to allow work on the agent websites before the company website went "live." Tribus "turned on" Greater Metro's basic agent websites on December 9, 2013. When Tribus "turned on" the basic agent websites, Greater Metro's agents could access and customize them. However, the agent websites were not "live" or accessible to the public until further action was taken by the agent to point his or her personal domain to Tribus' website.

In the following months, Greater Metro experienced several functional issues with the basic agent websites. "Agent About" boxes on the websites were not showing the agents' information. Agent websites included incorrect default header images and messages. MLS feeds were not displaying correctly for agents working as part of a team. MLS feeds were inconsistent among agent websites. Agents experienced difficulty linking themselves to their websites and opening search options in a new tab. "My Listing" headers appeared on agents' websites who had no listings. Many agents experienced difficulty logging on to their websites. The agent websites were difficult to customize, requiring agents to enter a code to change basic aspects of their websites, such as font or headings. Despite these issues, Greater Metro continued to work with Tribus to troubleshoot, as it wished to keep their relationship on an "even keel."

On December 20, 2013, eleven days after Tribus "turned on" the agent websites, Greater Metro contacted Tribus asking when the upgraded agent websites would be available to its agents. Tribus responded it would make the upgraded agent websites available "asap" once it received a list of agents eligible to receive an upgraded website. Upon Tribus' receipt of the agent list on December 20, 2013, Tribus told Greater Metro the upgraded agent websites were

not ready because custom coding needed to be completed. Tribus stated the upgraded agent websites would be ready in early January 2014. On January 29, 2014, Tribus informed Greater Metro that lead routing integration was still being completed on the upgraded agent websites. On February 11, 2014, Greater Metro asked Tribus to make the upgraded agent websites available. On February 13, 2014, Greater Metro emailed Tribus asking whether the upgraded agent websites were complete, stating, "When we signed our contract for services we were led to believe this was already up and running and ready to go." On February 24, 2014, Greater Metro emailed Tribus asking why Greater Metro could not access the upgraded agent websites. Ultimately, only four of the 350 Greater Metro agents successfully pointed their personal domains to their Tribus websites.

*Company Website*

The Contract provided Tribus would create a custom company website for Greater Metro and Greater Metro would pay Tribus $10,750 according to the following schedule: $5,375 upon execution of the Contract, $2,687.50 upon final design approval, and $2,687.50 twenty-four hours before the company's website's official deployment. The Contract stated the company website would be designed according to Greater Metro's specifications set forth in a design questionnaire. No time frame for completion of the company website was included in the Contract. However, based on correspondence it had with Tribus before executing the Contract, Greater Metro expected the company website to be completed within sixty to ninety days after the Contract's execution. On October 25, 2013, two days before the Contract was executed, Greater Metro emailed Tribus: "I believe [Tribus] said that . . . the company website would take 90 days to design and implement[ ] . . . ." Tribus did not dispute this time frame in its response to Greater Metro. On October 27, 2013, the day of the Contract's execution, Greater Metro

5

emailed Tribus, stating: "New agent sites immediately and custom built website in 60-90 days." Tribus also did not dispute this time frame in its response to Greater Metro.

Greater Metro paid Tribus $5,375 on October 28, 2013, and completed a design questionnaire regarding the company website on November 1, 2013. On November 18, 2013, Tribus produced an initial design of the company website for Greater Metro's review. On November 27, 2013, Greater Metro told Tribus the initial design did not follow Greater Metro's specifications. On December 31, 2013, Greater Metro followed up with Tribus, seeking a status update on the progress of the company website's design. In response, Tribus told Greater Metro it had "put things with the site on the backburner" and had not been working on it between November 27, 2013, and December 31, 2013. In early January 2014, Tribus produced a second design for the home page of the company website. Greater Metro responded with feedback on January 8, 2014.

On February 11, 2014, over three months after the Contract's execution, Greater Metro sent a message to Tribus requesting a meeting to review the latest draft of the company website design. On March 3, 2014, Greater Metro inquired whether Tribus could complete the company website within thirty days. Tribus responded it would need an additional thirty to thirty-five days to complete the company website after obtaining Greater Metro's final approval. Greater Metro never accepted and approved a final design for the company website, and the company website was never viewable by the public.

*CRM*

The Contract provided Tribus would license CRM to Greater Metro and Greater Metro would pay Tribus $5,500 per month for the first 250 user accounts. Tribus told Greater Metro staff and agents the following about CRM:

6

You can go in and set up as many dashboards to keep track of whatever you want to as you want. You can set up custom reports. You can keep track of how many leads that are coming in. You can keep track of your Zillow business; you can keep track of your Trulia business. You can keep track of everything. It is incredibly easy and it's literally a click, and, uh, you click two buttons and you have a new dashboard.

Greater Metro experienced several functional issues with CRM. Greater Metro first experienced difficulty syncing CRM with Microsoft Exchange and Outlook in December 2013. Greater Metro spent months working with Tribus to resolve this issue. The sync was not functioning until February 13, 2014. Greater Metro also experienced a "bug" in CRM causing duplicate values to appear. Greater Metro reported this issue on February 14, 2014, and the issue was not resolved until March 6, 2014. Greater Metro also could not access CRM from February 27, 2014, through March 3, 2014. Greater Metro never released CRM to its agents due to its lack of functionality.

### 2. Termination of the Contract and Payments

On January 3, 2014, Greater Metro messaged Tribus, requesting a face-to-face meeting to "review the status of [Greater Metro's] account," which Greater Metro believed was in "great distress." Greater Metro told Tribus it "had a lot of serious concerns about Tribus' ability to meet [its] contractual obligation." Tribus responded it could not meet face-to-face. By mid-March 2014, Greater Metro became concerned that continuing working with Tribus would cause it embarrassment and to lose agents. Greater Metro notified Tribus it was "not going to be moving forward with Tribus websites" on April 14, 2014. Then, Greater Metro sent a formal notice terminating the Contract on May 23, 2014. Greater Metro paid Tribus $20,760.80 from the Contract's execution until its termination. Greater Metro paid:

$5,375 for "website setup" on October 28, 2013;

7

$2,000 for November "marketing/branding" on November 1, 2013;

$2,400 for "exchange connector licenses" on November 25, 2013;

$5,500 for December "Tribus user fees" and December "marketing/branding" on December 1, 2013; and

$6,006.00 for January "user fees," $2,000 for January "marketing/branding"; and $980 for upgraded agent websites on January 1, 2014.[5]

Greater Metro contends it paid the January 1, 2014, invoice by mistake. Greater Metro made no payments following January 1, 2014. On May 27, 2014, Greater Metro contracted with Real Estate Digital ("RED"), another website developer.

### 3. Pre-Trial

Tribus filed a petition against Greater Metro on July 11, 2014, in St. Charles County Circuit Court, seeking payment for Greater Metro's "past due amounts" under the Contract. Tribus included two counts in its petition. In Count I, Tribus alleged Greater Metro breached the Contract by failing to make monthly payments from February 2014 through July 2014 and sought $25,000 or more. In Count II, Tribus contended it conferred benefits upon Greater Metro with Greater Metro's consent and acceptance and sought $50,978.69 under the principle of quantum meruit. Greater Metro filed its answer, affirmative defenses, and a counterclaim for breach of contract against Tribus on August 21, 2014. Greater Metro claimed Tribus breached the Contract by failing to timely provide functional agent websites; CRM; and adequate training, support, and troubleshooting to Greater Metro. Tribus filed its answer to Greater Metro's counterclaim and affirmative defenses on September 19, 2014.

During discovery, Tribus sent Greater Metro a request for production of all communications between Greater Metro staff and its agents regarding Tribus' websites. On

---

[5] The amounts listed were discounted by $5,500.20 due to credits Greater Metro received on its account with Tribus.

December 12, 2016, Greater Metro served its responses to Tribus' request. On January 3, 2017, Greater Metro supplemented its discovery responses. Unsatisfied with Greater Metro's responses, Tribus moved to compel Greater Metro's production of communications between its staff and agents. On May 5, 2018, the trial court ordered Greater Metro to supplement its responses to indicate whether any additional internal correspondence with its agents existed. On May 22, 2018, Greater Metro again supplemented its responses, indicating Greater Metro did not have and could not locate responsive correspondence beyond what it already produced.

### 4. Trial

A three-day bench trial commenced on September 4, 2018. Before evidence was introduced, Tribus' counsel generally requested the trial court enter written findings of fact and conclusions of law. Tribus called two witnesses as part of its case in chief. At the conclusion of Tribus' evidence, Tribus moved for an adverse inference against Greater Metro, asserting Greater Metro failed to comply with the trial court's order to produce communications between its staff and agents. The trial court heard argument on the motion. Tribus argued Greater Metro engaged in the spoliation of evidence by failing to preserve all emails between its staff and agents during the parties' relationship and asked the trial court to infer those emails would show the agents were satisfied with their websites. Greater Metro argued it produced all correspondence between its staff and agents it had in its possession. The trial court took Tribus' request for adverse inference under submission.

Greater Metro requested judgment be entered for Greater Metro on Tribus' quantum meruit claim. The trial court granted the motion and judgment was entered for Greater Metro and against Tribus on Count II of Tribus' petition. Greater Metro presented its case. Tribus called one witness in rebuttal. The trial court took the case under advisement.

Tribus and Greater Metro each filed their proposed findings of fact and conclusions of law on October 8, 2018. The trial court entered its judgment on November 14, 2018, adopting Greater Metro's proposed findings of fact and conclusions of law nearly verbatim. In its judgment, the trial court found for Greater Metro on both Tribus' claim for breach of contract and Greater Metro's counterclaim for breach of contract and awarded Greater Metro $20,760.80 in damages. The trial court found the evidence established Tribus and Greater Metro contemplated a sixty-to-ninety-day time frame for completion of the company website and a one-to-two-week time frame for completion of the agent websites. The trial court found the company website "was in fact never completed at all" and the agent websites were not provided to Greater Metro until over one month after the Contract's execution and were not functional for their intended purpose. The trial court further found Tribus did not provide CRM functional for its intended use. Therefore, the trial court concluded the evidence showed Tribus failed to perform its obligations under the Contract and Greater Metro's obligation to make further payments was never triggered. The trial court also denied Tribus' motion for adverse inference, concluding Tribus failed to prove Greater Metro intentionally participated in the spoliation of evidence.

Tribus now appeals.

## Standard of Review

Tribus' first point on appeal relates to whether the trial court properly applied the doctrine of spoliation, which is an issue of law we review *de novo*. *Prins v. Dir. of Revenue*, 333 S.W.3d 17, 20 (Mo. App. W.D. 2010) (quoting *DeGraffenreid v. R.L. Hannah Trucking Co.*, 80 S.W.3d 866, 872 (Mo. App. W.D. 2002), overruled on other grounds by *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003)). Tribus' second, third, and fourth points on appeal allege the trial court's judgment misapplies the law or is against the weight of the

10

evidence.  On review of a court-tried case, we will affirm the trial court's judgment "unless there is no substantial evidence to support it, it is against the weight of the evidence or it erroneously declares or applies the law."  *Aughenbaugh v. Williams*, 569 S.W.3d 514, 526 (Mo. App. E.D. 2018) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)).  "[T]he judgment is presumptively correct, and the appellant has the burden to demonstrate that the judgment is erroneous."  *Flooring Sys., Inc. v. Staat Constr. Co.*, 100 S.W.3d 835, 837 (Mo. App. E.D. 2003) (internal quotations omitted).  "Even if we find error, we cannot reverse the judgment unless we determine that the error 'materially affect[ed] the merits of the action.'"  *Scheck Indus. Corp. v. Tarlton Corp.*, 435 S.W.3d 705, 717 (Mo. App. E.D. 2014) (alteration in original) (citing Rule 84.13(b)).[6]

"Where a misapplication of law is asserted, our review is *de novo*."  *Smith v. Great Am. Assur. Co.*, 436 S.W.3d 700, 704 n.3 (Mo. App. S.D. 2014) (quoting *Jackson v. Mills*, 142 S.W.3d 237, 240 (Mo. App. W.D. 2004)).  "[I]n 'against the weight of evidence' claims, we must 'defer to the trial court's credibility determinations, explicit or implicit,' and can reverse 'only when we firmly believe the judgment is wrong.'"  *Id.* (quoting *Mitchell v. Mitchell*, 348 S.W.3d 816, 818 (Mo. App. S.D. 2011)).  An against-the-weight-of-the-evidence challenge accepts there is substantial evidence supporting a proposition necessary to sustain the judgment, "but, nevertheless, challenges the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact."  *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo. App. S.D. 2010).  We defer to the trial court's factual findings, as the trial court is in a superior position to assess credibility, and acknowledge the trial court "is free to believe none, part, or all of any witness's testimony."  *Russ v. Russ*, 39 S.W.3d 895, 898 (Mo. App. E.D. 2001) (citing *Gaar v. Gaar's Inc.*, 994 S.W.2d 612, 616 (Mo.

---

[6] All rule citations are to the Missouri Supreme Court Rules (2018).

App. S.D. 1999)).  "The evidence and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the trial court's judgment, and all contrary evidence and inferences must be disregarded."  *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo. App. W.D. 2000) (citing *Lance v. Lance*, 979 S.W.2d 245, 248 (Mo. App. W.D. 1998)).

Tribus' fifth point on appeal relates to whether the trial court's correctly calculated Greater Metro's damages award.  We defer to the trial court's award "unless the damages awarded are clearly wrong, could not have been reasonably determined, or were excessive."  *Am. Eagle Waste Indus., LLC v. St. Louis Cty., Missouri*, 463 S.W.3d 11, 19 (Mo. App. E.D. 2015) (internal citation omitted).  To the extent Tribus' points on appeal require us to interpret the Contract, "our review is *de novo*, as questions of contract interpretation are questions of law." *Scheck Indus. Corp.*, 435 S.W.3d at 718 (emphasis added) (citing *Wildflower Cmty. Ass'n, Inc.*, 15 S.W.3d at 534).

## Discussion

### I.    Point One: Adverse Inference

In Point One, Tribus argues the trial court "erroneously declared or erroneously applied the law" in denying its motion for adverse inference because Greater Metro "failed to search for, preserve, or produce" communications with its agents, despite having a duty to do so.[7]  Greater Metro argues it had no duty to preserve communications with its agents because it had no reason to believe the emails sent between Greater Metro staff and agents between December 2013 and

---

[7] In Points One through Four, Tribus' appellate brief contends the trial court erroneously declared the law in addition to misapplying the law.  However, in each of its argument sections, Tribus fails to develop its contention that the trial court erroneously declared the law.  Arguments raised in a point relied on that are not supported by argument in the argument portion of the brief are deemed abandoned and preserve nothing for appellate review.  *Luff v. Schoenhoff*, 935 S.W.2d 685, 687 (Mo. App. E.D. 1996).  Because Tribus' arguments are narrower than its points relied on, our review is limited to only the arguments developed in the argument portions of its brief.  *8000 Maryland, LLC v. Huntleigh Fin. Servs. Inc.*, 292 S.W.3d 439, 445 (Mo. App. E.D. 2009).  Therefore, we do not review Tribus' various contentions that the trial court erroneously declared the law.

April 2014 would be important to a claim or lawsuit, as its relationship with Tribus was amicable until April 2014 and it was unaware it should anticipate litigation until Tribus filed its lawsuit in July 2014. Greater Metro further argues the record is devoid of any evidence of intentional failure to preserve evidence.

"Spoliation is the intentional act of destruction or significant alteration of evidence." *Hill v. SSM Health Care St. Louis*, 563 S.W.3d 757, 761 (Mo. App. E.D. 2018) (citing *Pisoni v. Steak 'N Shake Operations, Inc.*, 468 S.W.3d 922, 925 (Mo. App. E.D. 2015)). "Spoliation may also be the concealment or suppression of relevant evidence or the failure to determine whether certain evidence exists." *Ball v. Allied Physicians Grp., L.L.C.*, 548 S.W.3d 373, 386 (Mo. App. E.D. 2018) (citing *Marmaduke v. CBL & Assocs. Mgmt., Inc.*, 521 S.W.3d 257, 269 (Mo. App. E.D. 2017)). Spoilators are subject to an adverse evidentiary inference where they are held "to admit that the destroyed evidence would have been unfavorable to their position." *Schneider v. G. Guilliams, Inc.*, 976 S.W.2d 522, 526 (Mo. App. E.D. 1998).

The burden is on the party seeking the benefit of the doctrine of spoliation "to prove the opponent destroyed, altered, concealed, or suppressed the evidence at issue under circumstances manifesting fraud, deceit, or bad faith." *Ball*, 548 S.W.3d at 386 (citing *Marmaduke*, 521 S.W.3d at 269). "[A] party's failure to adequately explain missing evidence[ ] may give rise to an adverse inference." *Marmaduke*, 521 S.W.3d at 269 (citing *Pisoni*, 468 S.W.3d at 926). In addition, "[a]n inference of fraud and a desire to suppress the truth may be established if the alleged spoliator had a duty or should have recognized a duty to preserve the evidence." *Hill*, 563 S.W.3d at 761 (citing *Marmaduke*, 521 S.W.3d at 269). "Simple negligence" in failing to preserve documents, however, "is not sufficient to apply the adverse inference rule." *Freight House Lofts Condo Ass'n v. VSI Meter Servs., Inc.*, 402 S.W.3d 586, 595 (Mo. App. W.D. 2013).

13

Tribus contends Greater Metro's failure to produce all communications between Greater Metro staff and its agents entitles it to an adverse inference. Tribus emphasizes Greater Metro failed to issue a litigation hold to ensure the preservation of emails and summarily states the trial court "failed to consider or apply the binding precedent in *Hill* and *Marmaduke* that the failure to preserve evidence in the face of a duty to preserve gives rise to an inference of fraud and a desire to suppress the truth." Both *Hill* and *Marmaduke* are inapposite to Tribus' case. Tribus' reliance on them is, therefore, misplaced.

In *Hill*, this Court found the plaintiff was entitled to an adverse inference because the defendant failed to give an adequate explanation regarding the destruction of certain video surveillance. 563 S.W.3d 757. The defendant claimed it did not have a certain surveillance video because the video was overwritten, but it provided varying time lengths for how long the video was stored before being recorded over on the surveillance system. *Id.* at 759-60. This Court held that because there were "overwhelming inconsistencies surrounding the destruction of the video surveillance[,] . . . an inference of fraud, deceit, or bad faith" arose. *Id.* at 762. Tribus advances no argument that Greater Metro's explanation regarding its failure to produce all communications between its staff and agents was inadequate. This Court's holding in *Hill* was not based on the duty the defendant had to preserve the surveillance video, as Tribus suggests, but rather on the defendant's failure to provide an adequate explanation regarding the destruction of the surveillance video. Therefore, *Hill* is not controlling here.

In *Marmaduke*, this Court found the plaintiff could have been entitled to an adverse inference because the defendant destroyed video surveillance, despite having a duty to preserve it. 521 S.W.3d 257. In *Marmaduke*, the plaintiff was a patron walking through the common area of a mall who slipped and fell on cheese sauce spilled on the floor and who sustained injuries.

*Id.* at 263. The mall investigated the incident and interviewed the patron at the scene of her fall; mall security personnel filled out a report for liability reasons. *Id.* at 263-64. Two weeks after the patron's fall, the mall received a letter from the patron's attorney formally notifying it of the patron's claim. *Id.* at 263. During discovery, the mall denied the existence of any videotape and the ability to create dispatch logs. *Id.* However, the mall's corporate representative and security supervisor revealed in their depositions that video recordings and dispatch logs were made on the day the patron fell and the mall took no action to preserve that evidence after receiving the letter from the patron's lawyer. *Id.*

The patron moved for sanctions, seeking an adverse inference against the mall under the spoliation doctrine. *Id.* The trial court denied her motion and held she was not entitled to an adverse inference but permitted her to present evidence at trial of the mall's usual practice of maintaining dispatch logs and use of video cameras. *Id.* at 264. The mall appealed the trial court's ruling, arguing that allowing the patron to present such evidence was error. *Id.* at 266. On appeal, this Court affirmed. *Id.* at 277. However, in dictum, this Court mentioned the trial court *could* have applied the doctrine of spoliation, as the mall had a duty to preserve all evidence relevant to the patron's claim. *Id.* at 273. This Court held the mall had a duty to preserve the video surveillance and dispatch logs because it was aware of the patron's fall on the day it occurred, as it made a report for liability reasons, and it knew it was subject to a claim regarding the patron's fall just two weeks after the incident, as it received a letter from the patron's attorney formally notifying it of the patron's claim. *Id.*

Circumstances similar to *Marmaduke*, which would have been sufficient to grant an adverse inference, do not exist here. Tribus sent no letter to Greater Metro formally notifying Greater Metro of its claim before it filed its lawsuit in July 2014. In addition, from December

15

2013 until April 2014, Greater Metro worked with Tribus in a positive manner, wishing to keep their relationship on an "even keel." Unlike the mall in *Marmaduke*, Greater Metro had no reason to believe emails between its staff and agents exchanged between December 2013 and April 2014 would be important to a potential lawsuit. The evidence fails to show facts from which the trial court had to infer Greater Metro should have recognized a duty to preserve all emails between its staff and agents. Further, the record is without any facts demonstrating when, or how, Greater Metro spoliated the emails. Therefore, the trial court did not erroneously apply the law in declining to grant an adverse inference because Greater Metro had or should have recognized a duty to preserve all emails between its staff and agents.

We further find Tribus presented no evidence that Greater Metro *intentionally* destroyed communications between its staff and agents. Tribus argues Greater Metro's failure to issue a litigation hold regarding all Tribus-related emails exchanged between its agents and staff is evidence that Greater Metro engaged in fraudulent, deceitful, and bad faith behavior. However, Tribus cites to no case—and we can find no case—that holds a failure to issue a litigation hold indicates fraud, deceit, or bad faith by an alleged spoliator. Tribus relies solely on the fact that Greater Metro could not produce all emails between its staff and agents as evidence that Greater Metro must have intentionally destroyed them. But "[t]he failure to produce . . . evidence, in and of itself, is not sufficient to warrant" application of the spoliation doctrine. *Freight House Lofts Condo Assoc.*, 402 S.W.3d at 596. Accordingly, the trial court did not erroneously apply the law in denying Tribus' motion for adverse inference.

Point One is denied.

16

## II. Point Two: Application of the Doctrines of Waiver and Frustration of Performance and Consideration of Evidence Not Offered or Admitted at Trial

In Point Two, Tribus argues the trial court "erroneously declared or erroneously applied the law" by entering judgment for Greater Metro on Tribus' breach-of-contract claim and on Greater Metro's breach-of-contract counterclaim and "its judgment was against the weight of the evidence" for several reasons.[8]  It argues the trial court erroneously found Tribus breached the Contract by failing to timely complete the agent and company websites because it failed to apply the doctrines of waiver and frustration of performance to excuse Tribus' nonperformance. Tribus also argues the trial court erroneously relied on and included Greater Metro's Exhibit 21, which was never entered into evidence, in its findings of fact.  Greater Metro argues the trial court properly declined to apply the doctrines of waiver and frustration of performance.  Greater Metro contends the trial court's inclusion of Greater Metro's Exhibit 21 in its findings of fact does not render its judgment against the weight of the evidence because substantial evidence supports the trial court's judgment without reference to those findings.  We address each of Tribus' multifarious points.

*Waiver*

Tribus argues the trial court's finding it breached the Contract by failing to timely provide the agent websites to Greater Metro was both an erroneous application of the law and against the weight of the evidence because the trial court failed to apply the doctrine of waiver to

---

[8] In Point Two, Tribus' appellate brief combines into the same point relied on a misapplication-of-the-law challenge and an against-the-weight-of-the-evidence challenge. "These are distinct claims." *Ivie v. Smith*, 439 S.W.3d 189, 199 n.11 (Mo. banc 2014) (internal citations omitted). "[E]ach *Murphy* ground is proved differently from the others *and* is subject to different principles and procedures of appellate review." *Smith v. Great Am. Assur. Co.*, 436 S.W.3d 700, 704 (Mo. App. S.D. 2014) (alteration in original) (footnote omitted).  As such, these challenges must appear in separate points relied on in the appellant's brief to be preserved for appellate review.  *See* Rule 84.04; *Stone v. Stone*, 450 S.W.3d 817, 820 (Mo. App. W.D. 2014) (internal quotations omitted) ("A single point relied on that groups multiple, disparate claims is multifarious, does not comply with Rule 84.04, and generally preserves nothing for review.").  Although it is well within our discretion to dismiss Tribus' appeal on this basis, we prefer to decide cases on their merits and, therefore, exercise our discretion to review Tribus' claims *ex gratia*.  *Stone*, 450 S.W.3d at 820.

excuse its nonperformance. Tribus argues Greater Metro waived any alleged time conditions associated with completion of the agent websites when it paid the January 2014 invoice, which was for "January user fees, marketing/branding, blog posts [and] PR, and agent websites, [upgraded] websites," after Tribus "turned on" Greater Metro's agent websites and then continued working with Tribus to resolve troubleshooting issues.

We note initially that the trial court did not erroneously apply the law when it found Tribus breached the Contract by failing to timely provide agent websites to Greater Metro. The trial court found Tribus breached the Contract when it did not provide the agent websites to Greater Metro "until over a month after the date of the Contract." The trial court concluded this through application of the law regarding time for performance under a contract when the contract is silent.

The parol evidence rule generally prohibits the trier of fact from admitting relevant evidence to "vary, alter or contradict the terms of a binding, unambiguous and integrated written contract." *State ex rel. Missouri Highway Transp. Comm'n v. Maryville Land P'ship*, 62 S.W.3d 485, 489 (Mo. App. E.D. 2001) (citing RESTATEMENT (SECOND) CONTRACTS[ ] § 214). Where no time for performance is fixed by contract, "the law implies a reasonable time to perform." *Miken Techs., Inc. v. Traffic Law Headquarters, P.C.*, 494 S.W.3d 609, 611 (Mo. App. E.D. 2016) (internal quotations omitted). However, "evidence of a prior oral agreement as to a specific time for performance is admissible to prove that a time or place was agreed on, and to rebut the usual presumptions that a party has a reasonable time for performance." *Prof'l Laundry Mgmt. Sys., Inc. v. Aquatic Techs., Inc.*, 109 S.W.3d 200, 204 n.3 (Mo. App. E.D. 2003) (internal citations omitted). This parol evidence is acceptable because it does not seek to vary or contradict the terms of the written agreement; "it is merely enabling the court to fill a gap by

adding something that is not expressed in the writing at all." *Beuc v. Morrissey*, 463 S.W.2d 851, 855 (Mo. banc 1971).

The trial court properly considered evidence of correspondence between Greater Metro and Tribus showing the parties contemplated a one-to-two-week time frame after the Contract's execution for completion of the agent websites. The Contract was silent as to when Tribus would provide the agent websites to Greater Metro. At trial, Greater Metro introduced evidence of correspondence it had with Tribus both two days before and the day of the Contract's execution. In that correspondence, Greater Metro expressed its belief that, while the company website would be available in sixty to ninety days, the agent websites would be available "immediately." Tribus never disputed that time frame in its responses to Greater Metro. Tribus responded, "We can definitely have [the agent websites] up and running within a week or two max." The trial court properly considered this parol evidence to rebut the usual presumptions and inferences as to the time for performance that would otherwise prevail. *Id.*

The trial court also did not misapply the law in declining to apply the doctrine of waiver to excuse Tribus' nonperformance. Waiver is the "intentional relinquishment of a known right." *State v. Coleman*, 449 S.W.3d 387, 389 (Mo. App. E.D. 2014) (quoting *Dorris v. State*, 360 S.W.3d 260, 267 (Mo. banc 2012)). "If waiver is implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right." *O'Connell v. Sch. Dist. of Springfield R-12*, 830 S.W.2d 410, 417 (Mo. banc 1992) (quoting *Shapiro v. Shapiro*, 701 S.W.2d 205, 206 (Mo. App. E.D. 1985)). Implied waiver will only be found where a party's actions are "so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of [its] conduct is possible." *Waterwiese v. KBA Const. Managers, Inc.*, 820 S.W.2d 579, 585 (Mo. App. E.D. 1991) (internal citation omitted). In

19

determining whether one party has waived another party's breach, "we must look at the totality of the circumstances." *Guidry v. Charter Commc'ns, Inc*., 269 S.W.3d 520, 531 (Mo. App. E.D. 2008) (citing *Harris v. Desisto*, 932 S.W.2d 435, 446 (Mo. App. W.D. 1996)).

The trial court did not make, and Tribus' counsel did not request, any specific findings regarding the doctrine of waiver. Tribus' counsel told the trial court before the introduction of evidence, "Additionally, Your Honor, I would like to ask that in this case you enter findings of fact and conclusions of law." "If a party desires findings of fact and conclusions of law, it is *that party's duty* to identify the issues to be included." *Timmons v. Timmons*, 132 S.W.3d 906, 918 (Mo. App. W.D. 2004) (alterations in original) (quoting *In re Marriage of Colley*, 984 S.W.2d 163, 171 (Mo. App. S.D. 1998)); *see also* Rule 73.01(c). "Rule 73.01(c) . . . does not require the trial court to generally issue findings of fact and conclusions of law"; rather, the rule requires that, upon counsel's timely request, the trial court must "issue findings on those controverted fact issues as have been specified by counsel." *Patterson v. Patterson,* 207 S.W.3d 179, 187 (Mo. App. S.D. 2006) (emphasis omitted) (quoting *Jefferson v. Bick*, 872 S.W.2d 115 121 (Mo. App. E.D. 1994)). All fact issues upon which no specific findings are made "are considered as having been found in accordance with the result reached." Rule 73.01(c); *Sulkin v. Sulkin*, 552 S.W.3d 793, 795 (Mo. App. E.D. 2018) (internal citations omitted) (""[W]hen the trial court has made no specific findings on a factual issue, such findings are interpreted as having been found in accordance with the trial court's judgment.").

Greater Metro's payment of the January 2014 invoice and decision to allow Tribus to troubleshoot the functional issues with the agent websites do not "clearly and unequivocally" indicate its waiver of the parties' agreed time for performance. Greater Metro reasonably explained its conduct; it stated it paid the January 2014 invoice by mistake and wished to

20

maintain a positive relationship with Tribus in the initial weeks after the Contract's execution. Therefore, the trial court's decision not to apply the doctrine of waiver was not a misapplication of the law.

We also find the trial court's conclusion Tribus breached the Contract by failing to timely provide the agent websites to Greater Metro and decision not to apply the doctrine of waiver was not against the weight of the evidence. We "assume[] a trial court believed the testimony consistent with its judgment." *In re Marriage of Heirigs*, 34 S.W.3d 835, 841 (Mo. App. S.D. 2000) (internal citation omitted). The trial court was free to believe Greater Metro's testimony regarding the parties' contemplation of the time for performance, its payment of the January 2014 invoice by mistake, and its desire to keep its relationship with Tribus on an "even keel" in the initial months after the Contract's execution while Tribus attempted to resolve various issues with the agent websites. This evidence, in the context of all the evidence before the trial court, was probative. *Houston*, 317 S.W.3d at 186. Because of our deference to the trial court's factual findings, we are not left with a firm belief that the trial court's judgment concluding that Tribus did not perform its obligation to timely provide agent websites to Greater Metro is wrong.

*Frustration of Performance*

Tribus argues the trial court's finding it breached the Contract by failing to timely provide the company website to Greater Metro was both an erroneous application of the law and against the weight of the evidence because the trial court failed to consider that Greater Metro did not timely respond to requests for approval of the company website, which hindered and delayed Tribus' performance. Tribus maintains the trial court erred in failing to apply the doctrine of frustration of performance to excuse its nonperformance.

21

We note initially that the trial court did not erroneously apply the law when it found Tribus breached the Contract by failing to timely provide the company website to Greater Metro. The trial court found the company website was not provided to Greater Metro within sixty to ninety days after the Contract's execution and was never functionally deployed or accepted by Greater Metro. Therefore, the trial court concluded Greater Metro's payment obligation under the Contract was never triggered. Just as above, the trial court concluded this through application of the law regarding time for performance under a contract when the contract is silent. The Contract was silent as to when Tribus would provide the company website to Greater Metro. At trial, Greater Metro introduced evidence of correspondence it had with Tribus both two days before and the day of the Contract's execution. In that correspondence, Greater Metro expressed its belief that the company website would be available within sixty to ninety days after the Contract's execution. Tribus never disputed that time frame in its responses to Greater Metro. The trial court properly considered this parol evidence to rebut the usual presumptions and inferences as to the time for performance that would otherwise prevail. *Beuc*, 463 S.W.2d at 855.

The trial court also did not erroneously decline to apply the doctrine of frustration of performance to excuse Tribus' nonperformance. Missouri courts recognize that "[o]ne who hinders performance by the other party may not avail himself of the nonperformance which he induced or occasioned." *Hillis v. Blanchard*, 433 S.W.2d 276, 279 (Mo. banc 1968). "Where a [party] prevents the performance of a condition of a contract, the condition is excused." *Sassenrath v. Sassenrath*, 657 S.W.2d 671, 674 (Mo. App. E.D. 1983) (internal citation omitted). However, "[i]mplicit in this principle is the recognition that the party who is hindered or

prevented from performing would have performed except for the acts of the inhibiting party."
*AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714, 718 (Mo. App. W.D. 1995).

The trial court did not make, and Tribus' counsel did not request, any specific findings regarding the doctrine of frustration of performance. Because Tribus did not so request, we cannot find the trial court erred in failing to make findings about the doctrine of frustration of performance. *See Patterson*, 207 S.W.3d at 187; *Timmons*, 132 S.W.3d at 918. All fact issues upon which no specific findings are made "are considered as having been found in accordance with the result reached." Rule 73.01(c); *See Sulkin*, 552 S.W.3d at 795. On December 31, 2013, approximately two months after the Contract was executed, Greater Metro contacted Tribus regarding the status of the company website. Tribus responded it "put things with the site on the backburner" and had not been working on the company website. Tribus produced a draft of the company website's design in early January 2014 and Greater Metro responded with feedback on January 8, 2014. Tribus told Greater Metro on March 3, 2014, over three months after the Contract's execution, that Tribus would need an additional thirty to thirty-five days after receiving Greater Metro's final approval to complete the company website. These factual findings do not establish Tribus would have completed the company website within sixty to ninety days but for Greater Metro's conduct. Therefore, the trial court's decision not to apply the doctrine of frustration of performance was not a misapplication of the law.

We also find the trial court's conclusion Tribus breached the Contract by failing to timely provide the company website to Greater Metro and decision not to apply the doctrine of frustration of performance was not against the weight of the evidence. We "assume[] a trial court believed the testimony consistent with its judgment." *Heirigs*, 34 S.W.3d at 841 (internal citation omitted). The trial court was free to believe Greater Metro's testimony it timely

23

responded to Tribus' design of the company website and that it was told Tribus would need an additional thirty to thirty-five days to complete the company website after receiving its final approval as of March 2014. This evidence, in the context of all the evidence before the trial court, was probative. *Houston*, 317 S.W.3d at 186. Given our deference to the trial court's factual findings, we are not left with a firm belief that the trial court's judgment concluding that Tribus did not perform its obligation to timely provide the company website to Greater Metro is wrong.

*Improper Factual Finding*

Tribus argues the trial court's conclusion it failed to timely provide the agent websites to Greater Metro is against the weight of the evidence because the trial court, in adopting Greater Metro's proposed findings of fact and conclusions of law nearly verbatim, included a reference to Greater Metro's Exhibit 21 in its findings of fact. Greater Metro's Exhibit 21 was neither offered nor admitted into evidence. Tribus argues the trial court's reference to Greater Metro's Exhibit 21 in its findings of fact renders its conclusion that Tribus breached the Contract by failing to timely provide the agent websites against the weight of the evidence.

As an initial matter, we note that, except for adding a conclusion of law regarding its ruling on Tribus' motion for an adverse inference, the trial court simply adopted Greater Metro's proposed findings of fact and conclusions of law. "We harbor significant reservations over" this practice. *Arcese v Daniel Schmitt & Co.*, 504 S.W.3d 772, 782 n.7 (Mo. App. E.D. 2016). While verbatim adoption of a party's proposed findings and judgment is "not erroneous *per se*," it is unwise in a contested case and this Court and the Supreme Court of Missouri have repeatedly warned against it. *King v. King*, 548 S.W.3d 440, 442 n.1 (Mo. App. E.D. 2018) (citing *State v. Griffin*, 848 S.W.2d 464, 471 (Mo. banc 1993); *Neal v. Neal*, 281 S.W.3d 330,

24

337 (Mo. App. E.D. 2009); and *Binkley v. Binkley*, 725 S.W.2d 910, 911 n.2 (Mo. App. E.D. 1987)). *See also Arcese*, 504 S.W.3d at 782 n.7 (citing *Griffin*, 848 S.W.2d at 471) ("For obvious reasons, when a court adopts in its entirety the proposed findings of fact and conclusions of law of one of the parties, there may be a problem with appearance. The judiciary is not and should not be a rubber-stamp for anyone.").

"Even the most conscientious advocate cannot reasonably be expected to prepare a document which would reflect precisely the trial court's view of the evidence." *E.L.S. v. F.M.S.*, 829 S.W.2d 19, 21 (Mo. App. E.D. 1992) (quoting *Binkley*, 725 S.W.2d at 911 n.2). The final decree comes from the court; therefore, "[t]rial judges should draft their own fair and impartial judgments." *King*, 548 S.W.3d at 442 n.1. We believe once parties have had their "day in court" they are also entitled to their "day" in the court's chambers such that the court's judgment is not an advocate's view of the evidence.

Although we admonish the trial court's wholesale adoption of Greater Metro's proposed findings of fact and conclusions of law, Tribus' argument is without merit. These factual findings of the trial court reference Greater Metro's Exhibit 21:

49.    Chrissy Patzke, Manager of the IT and Accounting Department for Greater Metro, sent Greater Metro's agent roster to Tribus on November 4, 2013. (Defendant's Exhibit 21).

50.    On November 5, 2013, Chrissy Patzke sent an email to Tribus inquiring whether Tribus had received the agent roster. (Defendant's Exhibit 21).

51.    On November 7, 2013, Katie Ragusa sent an email to Chrissy Patzke indicating that the agent roster had gone to her spam folder and that she would begin processing the roster immediately. (Defendant's Exhibit 21).

However, the trial court made these conclusions of law regarding Tribus' production of the agent websites:

25

9. The evidence establishes that Tribus and Greater Metro contemplated a 1-2 week time frame for making the agent websites available to Greater Metro. Greater Metro expressed its belief that the agent websites would be ready in 1-2 weeks on numerous occasions and testified that this belief was based upon representations by Tribus. Tribus never informed Greater Metro that 1-2 was not a reasonable or appropriate time frame for completion of the agent websites.

10. The evidence establishes that the agent websites were not made available to Greater Metro until over a month after the date of the Contract.

11. As such, the evidence demonstrates that Tribus did not perform its obligation to make the agent websites available to Greater Metro within 1-2 weeks from the date of the Contract.

12. The evidence establishes that Tribus did not provide agent websites that were functional for their intended purpose. The agent websites provided by Tribus did not properly display listing feeds, were not able to be customized by agents with reasonable effort, and contained numerous "bugs" which required correction by Tribus' programmers.

13. As such, the evidence demonstrates that Tribus did not perform its obligation to provide agent websites to Greater Metro.

A close reading of the trial court's judgment reveals the factual findings Tribus challenges do not substantially underpin the trial court's conclusions of law. "[A trial] court's erroneous findings concerning immaterial facts do not invalidate its judgment so long as it is supported sufficiently by substantial and competent evidence." *State ex inf. Sanders, ex rel. City of Lee's Summit v .City of Lake Lotawana*, 220 S.W.3d 794, 806 (Mo. App. W.D. 2007) (citing *George C. Prendergast Const. Co. v. Goldsmith*, 201 S.W. 354, 356 (Mo. 1917), abrogated on other grounds by *City of Lake Saint Louis v. City of O'Fallon*, 324 S.W.3d 756 (Mo. banc 2010)). The trial court made several factual findings regarding the one-to-two-week time frame contemplated by the parties for completion of the agent websites. The trial court also made several factual findings regarding the functional issues Greater Metro experienced with the agent websites after they were "turned on" for Greater Metro agents on December 9, 2013. These factual findings, notwithstanding the factual findings referencing Greater Metro's Exhibit 21,

26

sufficiently support the trial court's conclusion that Tribus breached the Contract by failing to timely provide agent websites to Greater Metro.

Point Two is denied.

### III.    Point Three: Interpreting Tribus' Contract Obligations

In Point Three, Tribus argues the trial court "erroneously declared or erroneously applied the law" by entering judgment for Greater Metro on Tribus' claim for breach of contract because Greater Metro's claimed breaches regarding the functionality of the agent websites and CRM were not based on obligations appearing in the integrated Contract and the trial court failed to find the alleged breaches were material.[9]  Tribus maintains that, because the functional defects alleged by Greater Metro and found by the trial court were not functions Tribus promised to provide in the integrated Contract, the trial court erred in considering parol evidence regarding those defects.  Greater Metro argues the trial court properly considered evidence of functional defects, as the term "functionality" is ambiguous and parol evidence is admissible to interpret ambiguous contract terms.  Greater Metro further argues the fact the trial court made no findings regarding the materiality of Tribus' breaches was not erroneous, as Tribus' counsel never specifically requested findings about materiality.

*Parol Evidence*

Tribus challenges the trial court's conclusions that "Tribus did not provide agent websites that were functional for their intended purpose" and Tribus ""did not provide . . . CRM . . . that

---

[9] In the argument portion of Tribus' Point III, it contends the trial court's finding that it breached the Contract by failing to provide several specific functions relating to the agent websites and CRM was "against the weight of the evidence." However, this challenge is nowhere stated in its point relied on. We reiterate this challenge is separate and distinct from a challenge that the trial court erroneously declared or erroneously applied the law. *Ivie*, 439 S.W.3d at 199 n.11 (internal citations omitted). Further, an appellant shall limit argument to those errors included in its points relied on. Rule 84.04(e). Arguments not encompassed by the point relied on are not preserved for review. *DeWalt v. Davidson Serv./Air, Inc.*, 298 S.W.3d 491, (Mo. App. E.D. 2013) (citing Rule 84.04(e) and *Gamber v. Missouri Dep't of Health & Senior Servs.*, 225 S.W.3d 470, 477 (Mo. App. W.D. 2007)). Because Tribus failed to challenge the trial court's finding as "against the weight of the evidence" in its point relied on, we do not entertain any such challenge raised in the argument portion of Tribus' Point III.

was functional for its intended purpose." Tribus contends the trial court erroneously reached these conclusions based on Greater Metro's introduction of evidence of several defects not encompassed in the "functionality" promised by Tribus in the integrated Contract. Tribus argues that evidence included IDX functionality for agent "teams"; appearance of "area listings" on agent websites; linking agents to their agent websites; opening search options in a new tab; customization of agent websites; syncing CRM with Exchange Server and Outlook; periodic inaccessibility of CRM; and the appearance of duplicative values on CRM.

"In the absence of fraud, accident, mistake, or duress, the parol evidence rule prohibits evidence of prior or contemporaneous oral agreements that vary or contradict the terms of an unambiguous, final, and complete writing." *Rosenfeld v. Boniske*, 445 S.W.3d 81, 87 (Mo. App. E.D. 2014) (internal quotations omitted). "The parol evidence rule is a substantive rule of contract law and exists to preserve the sanctity of written contract." *Topper v. Midwest Div., Inc.*, 306 S.W.3d 117, 130 (Mo. App. W.D. 2010) (internal quotations omitted). Evidence violating the parol evidence rule must be ignored whether the evidence was admitted with or without objection. *Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517, 522 (Mo. App. W.D. 2007) (quoting *Helterbrand v. Five Star Mobile Home Sales, Inc.*, 48 S.W.3d 649, 658 (Mo. App. W.D. 2001)).

Proper application of the parol evidence rule requires us to determine: "(1) . . . whether the writing is the 'final' and 'complete' agreement, and (2) . . . what meaning to give the language used in that agreement." *Jake C. Byers, Inc. v. J.B.C. Invs.*, 834 S.W.2d 806, 811 (Mo. App. E.D. 1992). "A written agreement is integrated if it represents a final expression of one or more terms of the agreement." *Rosenfeld*, 445 S.W.3d at 87 (quoting *Maryville Land P'ship*, 62 S.W.3d at 489). "[W]e look to the face of the document itself" to decide if a document is

integrated "without considering the surrounding facts and circumstances." *Id.* (citing *Maryville Land P'ship*, 62 S.W.3d at 489). "The existence of a merger [or integration] clause may be a strong indication the writing is intended to be complete, but its existence is not necessarily determinative." *Byers*, 834 S.W.2d at 813 (internal citations omitted).

We find the Contract here is facially incomplete, notwithstanding its inclusion of an integration clause. The Contract provides Tribus will "provide a custom built website, integrated backend system software, . . . and certain consulting services," to Greater Metro, however, neither the Contract nor the attached Statement of Work state with precision what particular services Greater Metro could expect to receive. Although the Statement of Work provides Tribus will "[d]evelop 1 custom WordPress website theme" and design several page templates "following [Greater Metro]'s guidelines set in the Design Questionnaire," the Statement of Work is silent as to which custom services would be provided regarding the agent websites and CRM. Because the Contract was not complete on its face, evidence extrinsic to it was not precluded by the parol evidence rule. *Kenney v. Vansittert*, 277 S.W.3d 713, 719-20 (Mo. App. W.D. 2008).

Even if we construed the Contract as complete on its face, its terms are ambiguous. Under Missouri law, "[t]he primary rule of contract construction is to 'ascertain the intent of the parties and give effect to that intention.'" *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. banc 2012) (quoting *DeBaliviere Place Ass'n v. Veal*, 337 S.W.3d 670, 676 (Mo. banc 2011)). Where a contract is unambiguous, the intent of the parties must be "discerned from the contract alone based on the plain and ordinary meaning of the language used" and without use of parol evidence. *Id.* (citing *DeBaliviere Place Ass'n*, 337 S.W.3d at 676). Where a contract is ambiguous and the ambiguity "cannot be resolved within the four corners of the contract . . . the parties' intent can be determined by use of parol evidence." *State ex rel. Pinkerton v.*

*Fahnestock*, 531 S.W.3d 36, 46 (Mo. banc 2017) (citing *Whelan*, 379 S.W.3d at 846). "Equivocal terms in a contract may be interpreted in light of all the surrounding circumstances, including applicable customs and usages, as well as the contracting parties' own interpretation of the contract." *ATC Co., Inc. v. Myatt*, 435 S.W.3d 135, 142 (Mo. App. E.D. 2014) (quoting *Graham v. Goodman*, 850 S.W.2d 351, 355 (Mo. banc 1993)).

"Whether an agreement is ambiguous is a question of law." *CIT Grp./Sales Fin. Inc. v. Lark*, 906 S.W.2d 865, 868 (Mo. App. E.D. 1995). "A contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable men may fairly and honestly differ in their construction of the terms." *Byers*, 834 S.W.2d at 816 (internal citations omitted). Ambiguity takes two forms: "patent or latent." *Id.* "A patent ambiguity arises from the face of the document; a latent ambiguity arises when the particular words of a document apply equally well to two different objects or some external circumstances makes their meaning uncertain." *Id.* (internal citations omitted). "To determine whether a contract is ambiguous, we consider the whole instrument and give the words in the contract their natural and ordinary meaning." *Id.* (internal citations omitted).

We find the Contract here is patently ambiguous. Nowhere in the Contract is "functionality" defined except that the term of the Contract would begin when "the website is functionally deployed and accepted by [Greater Metro]" and "functionality of each design must fall within the offerings of Tribus." Merriam-Webster's Online Dictionary defines "function" as "the action for which a person or thing is specifically fitted or used."[10] Similarly, "functional" is

---

[10] *Function*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/function#h1 (last visited Nov. 5, 2019).

30

defined as being "designed or developed chiefly from the point of view of use"[11] and "functionality" is defined as "the quality or state of being functional."[12] The term "functionality," when considered in this Contract, is ambiguous. Tribus builds and markets highly sophisticated company and agent websites and CRM with various capabilities for real estate brokerages. Given the technologically-advanced nature of Tribus' services, the term "functionality" is susceptible to different meanings. This Court has held that ambiguity arises where a contract term is not defined in the agreement. *See Aluminum Prods. Enters. v. Fuhrmann Tooling*, 758 S.W.2d 119, 124 (Mo. App. E.D. 1988). The trial court correctly admitted evidence of functional defects, as that evidence helped the trial court interpret Tribus' obligations to provide design "functionality" under the Contract.

*Materiality*

Tribus also argues in Point Three the trial court failed to make findings that the breaches alleged by Greater Metro were "material" and such failure "compels reversal." However, because Tribus' counsel did not specifically request such findings, we cannot conclude the trial court erred in not making more detailed findings of fact and conclusions of law about materiality. *See Patterson*, 207 S.W.3d at 187; *Timmons*, 132 S.W.3d at 918.

Point Three is denied.

### IV. Point Four: Whether Greater Metro was First to Breach the Contract

In Point Four, Tribus argues the trial court "erroneously declared or erroneously applied the law" in entering judgment for Greater Metro on Tribus' breach-of-contract claim and Greater Metro's breach-of-contract counterclaim because Greater Metro was the first to materially

---

[11] *Functional*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/functional (last visited Nov. 5, 2019).

[12] *Functionality*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/functionality (last visited Nov. 5, 2019).

breach the Contract when it failed to furnish information, items, personnel required to complete the company website beginning in January 2014; stopped paying invoices when due past January 2014; and anticipatorily repudiated the Contract in its April 14, 2014, email to Tribus. Greater Metro argues the trial court correctly concluded Tribus was the first to breach the Contract.

Tribus' argument is without merit. For reasons already stated in this opinion, we find the trial court did not misapply the law in finding Tribus breached the Contract by its nonperformance. The trial court found Tribus breached the Contract when Tribus did not "ma[ke] the agent websites available to Greater Metro until over one month after the date of the Contract." The Contract was executed on October 27, 2013. Therefore, the trial court found Tribus breached the Contract as early as November 2013. However, each breach Tribus claimed Greater Metro committed "first" occurred in January 2014 or later. We find the trial court did not err in finding Tribus breached the Contract by its nonperformance and Greater Metro's obligations to pay Tribus were never triggered.

Point Four is denied.

### V.    Point Five: Damages

In Point Five, Tribus argues the trial court erred in awarding $20,760.80 in damages to Greater Metro because (1) the trial court placed Greater Metro in a better position than it would have been in absent Tribus' alleged breach by failing to consider the money Greater Metro saved when it contracted with RED and (2) Greater Metro failed to introduce competent evidence of its damages. Greater Metro argues the fact it contracted with RED after terminating the Contract with Tribus is irrelevant and the trial court appropriately awarded it the exact amount, as verified in invoices and testimony, it paid Tribus before terminating the Contract.

"The proper measure of damages is a question of law for determination by the trial court." *Bus. Men's Assurance Co. of Am. v. Graham*, 891 S.W.2d 438, 449 (Mo. App. W.D. 1994) (citing *De Long v. Broadston*, 272 S.W.2d 493, 497 (Mo. App. 1954)). "The proper amount of damages is the amount that would make the injured party whole." *Miken Techs., Inc.*, 494 S.W.3d at 612 (citing *Turner v. Shalberg*, 70 S.W.3d 653, 658 (Mo. App. S.D. 2002)). "In a breach of contract case, the measure of damages is the benefit of the bargain, *i.e.*, the value of the performance of the contract." *Id.* (internal citations omitted). "The party claiming damages has the burden of proving the existence and amount of damages with reasonable certainty." *Manors at Vill. Green Condo., Inc. v. Webb*, 341 S.W.3d 162, 164 (Mo. App. E.D. 2011) (internal quotations and citations omitted).

The trial court concluded Greater Metro had not received a functional company website or functional agent websites and CRM under the Contract and was entitled to a refund of the payments it had made to Tribus: $20,760.80. This amount is rational and verifiable, as Greater Metro introduced into evidence several invoices reflecting the payments it made to Tribus and the testimony of a Greater Metro executive regarding those payments. Tribus' argument the trial court erred in failing to consider the money Greater Metro saved when it contracted with RED is irrelevant. Tribus cites no case law that requires a trial court to reduce the amount of a damages award when the non-breaching party makes reasonable efforts to mitigate its damages. To the contrary, the non-breaching party's damage recovery may be reduced if it *fails* to make reasonable efforts to mitigate damages. *Spencer v. Millstone Marina, Inc.*, 890 S.W.2d 673, 677 (Mo. App. W.D. 1994). *See also Wolf v. Missouri State Training Sch. for Boys*, 517 S.W.2d 138, 143 (Mo. banc 1974). Reducing Greater Metro's damages award because it contracted with

RED after Tribus breached the Contract would provide a windfall to Tribus, as doing so would allow Tribus to reap the benefits of its own failure to perform.

The trial court's damages award is not clearly improper or excessive but was instead reasonably determined. *Hazelcrest III Condo. Assoc. v. Bent*, 495 S.W.3d 200, 207 (Mo. App. E.D. 2016). Accordingly, we cannot conclude the trial court erred in calculating Greater Metro's damages.

## Conclusion

The judgment of the trial court is affirmed.

_____
Philip M. Hess, Presiding Judge

Kurt S. Odenwald, J. and
Lisa P. Page, J. concur.